IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al.,        ) | |
| ) | |
| Plaintiffs,     ) | |
| ) | |
| v.     ) | Civil Action No. 07-1676 (RMC) |
| ) | |
| LMR CONSTRUCTION CO., INC.,    ) | |
| ) | |
| Defendant.     ) | |
| ) | |

**MOTION FOR ENTRY OF DEFAULT JUDGMENT
AND INCORPORATED MEMORANDUM IN SUPPORT THEREOF**

Plaintiffs, by their attorneys, and in accordance with Federal Rule of Civil Procedure 55(b)(2), move this Court to enter a default judgment in favor of the Plaintiffs and against Defendant in the amount of $42,475.46 on the ground that default has been entered against Defendant for failure to answer the Complaint of Plaintiffs. This motion is supported by the Declarations of David F. Stupar, attached hereto as Exhibit A, and Ira R. Mitzner, attached hereto as Exhibit B. The certificate of the Clerk of this Court declaring Defendant in default is attached hereto as Exhibit C. A copy of the Complaint filed by Plaintiffs is attached hereto as Exhibit D.

## FACTS

Plaintiffs, John Flynn, et al., filed the Complaint in this case on September 21, 2007. On November 13, 2007, LMR Construction Co., Inc. ("LMR Construction") was served with the Summons and Complaint. Defendant has failed to file an Answer to the Complaint. On December 11, 2007, default was entered by the Clerk of this Court against Defendant, LMR Construction.

## ARGUMENT

Rule 55 of the Federal Rules of Civil Procedure provides that when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, the clerk shall enter the party's default and "the party entitled to a judgment by default shall apply to the court therefor." Defendant has failed to answer the Complaint, default has been entered by the Clerk, and Plaintiffs are entitled to judgment. Accordingly, Plaintiffs' motion for a default judgment should be granted. *See, e.g.*, *Trustees of the Local 306, United Ass'n. Health & Welfare Fund v. Am. Testing & Inspection, Inc.*, No-88-2274-OG, 1988 WL 134942, *1 (D. D.C. Nov. 30, 1988) (entering default judgment where "defendant has failed to respond at any step of these proceedings or otherwise enter an appearance"); *Sanderford v. Prudential Ins. Co. of Am.*, 902 F.2d 897, 901 (11th Cir. 1990) (affirming entry of default judgment as "[n]either the text of the Federal Rules, nor judicial interpretation placed in the rules by the Federal Courts contemplate that a party may totally ignore pleadings and notices it receives").

DSMDB-2389843v01

## CONCLUSION

For the foregoing reasons, a default judgment in favor of Plaintiffs and against Defendant in the amount of $42,475.46 should be entered.

Date: March _____5_____, 2008        Respectfully submitted,

By _____

Ira R. Mitzner (D.C. Bar No. 184564)
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, DC  20006
(202) 420-2234

Counsel for Plaintiffs

DSMDB-2389843v01

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     Civil Action No. 07-1676 (RMC) |
| | ) |
| LMR CONSTRUCTION CO., INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF DAVID F. STUPAR IN SUPPORT
## OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

Pursuant to 28 U.S.C. § 1746, I, DAVID F. STUPAR, hereby declare as follows:

1.    I am the Executive Director of the Bricklayers & Trowel Trades International Pension Fund ("IPF" or "Fund") and am also an authorized representative to effect collections on behalf of the International Masonry Institute ("IMI") as specified in the General Collection Procedures of the Central Collection Unit ("CCU") of the Bricklayers and Allied Craftworkers ("Collection Procedures" or "Procedures") (attached at Tab 1). I have personal knowledge of the facts stated herein and, if called to testify as a witness, I could and would competently testify as set forth below.

2.    The IPF is a multiemployer employee benefit plan subject to ERISA. The IPF is governed by an equal number of employer-appointed and union-appointed Trustees, pursuant to the Taft-Hartley Act. Benefits under the plan are funded by contributions from participating employers.

3.    The Fund provides pension and other benefits to employees who work in the construction industry under contracts negotiated between Bricklayer local unions and employers.

Pursuant to these contracts, the employers are obligated to make contributions to the Fund in order to fund the benefits provided to the beneficiaries. The Trustees of the Fund have a fiduciary duty under ERISA to collect delinquent employer contributions, and the Trustees can be held personally liable for their failure to do so. 29 U.S.C. §§ 1104, 1109, 1132(g)(2). The Fund is administered in the District of Columbia.

4.      The Trustees adopted the CCU Collection Procedures governing the collection of employer contributions and reports.

5.      Under these Procedures, contributions and reports are due on or before the 15th day of the month ("Due Date") following the month in which work is performed. Once contributions are delinquent, the Procedures authorize the assessment of interest at 15 percent per annum and an additional amount, the greater of 15 percent per annum or 20 percent of the delinquent contributions, in the form of an additional computation of interest or liquidated damages.

6.      I am personally familiar with the account of LMR Construction Co., Inc. ("LMR Construction" or "Defendant").

7.      LMR Construction, acting through its authorized agent or officer, signed a collective bargaining agreement ("Agreement") with the International Union of Bricklayers and Allied Craftsmen Local Union No. 46 Ohio ("Local 46 OH"), which obligated LMR Construction to submit monthly reports and payments to the IPF and IMI on behalf of its covered employees pursuant to the foregoing Procedures.

8.      LMR Construction has performed work in the jurisdiction of Local 46 OH, which is covered by the Agreement.

9.      Although Defendant submitted reports and has paid some contributions to the IPF and IMI for work performed pursuant to the Agreement in the jurisdiction of Local 46 OH during the time period June 2005 through January 2006, Defendant has failed to fully pay contributions due Plaintiffs for this time period. The IPF has prepared a Recap of these hours reported but not fully paid, based on the reports submitted by Defendant.

10.     As provided for in ERISA Section 502(g)(2)(A), Defendant owes the IPF and IMI contributions in the amount of $994.68 for work performed during the time period June 2005 through January 2006, as determined by the IPF Recap.

11.     As further provided for in ERISA Section 502(g)(2)(B) and under the terms of the Collection Procedures, interest in the amount of $316.16 on such delinquent contributions, calculated at a rate of 15 percent per annum from the Due Date through February 25, 2008, is owed the IPF by Defendant. Moreover, pursuant to ERISA Section 502(g)(2)(C)(ii) and the Collection Procedures, liquidated damages in the amount of $198.07, calculated at the rate of 20 percent have been assessed on such delinquent contributions due the IPF and IMI for work performed during the time period June 2005 through January 2006.

12.     In addition, Defendant failed to submit either reports or contributions to the IPF and IMI for work performed pursuant to the Agreement in the jurisdiction of Local 46 OH during the months of April 2007 through January 2008. Accordingly, Plaintiffs have been forced to estimate the total due Plaintiffs in connection with work performed pursuant to the Agreement during this time period, by calculating the average number of hours worked by Defendant during

3

2389157.01

the preceding twelve-month period and multiplying that average number of hours worked by the applicable hourly rates for the months of April 2007 through January 2008.

13.     As provided for in ERISA Section 502(g)(2)(A), Defendant is estimated to owe the IPF and IMI contributions in the amount of $31,489.61 for work performed during the time period April 2007 through January 2008.

14.     As further provided for in ERISA Section 502(g)(2)(B) and under the terms of the Collection Procedures, interest in the amount of $1,807.81 on such delinquent contributions and estimated delinquent contributions, calculated at a rate of 15 percent per annum from the Due Date through February 25, 2008, is owed the IPF by Defendant.  Moreover, pursuant to ERISA Section 502(g)(2)(C)(ii) and the Collection Procedures, liquidated damages in the amount of $5,009.28, calculated at the rate of 20 percent have been assessed on such delinquent contributions and estimated delinquent contributions due the IPF for work performed during the time period April 2007 through January 2008.

15.     As of the date of this Declaration, despite due demand thereof, Defendant has failed to pay moneys due the IPF and IMI in connection with work performed pursuant to the Agreement during the months specified above.

16.     Thus, as provided for in ERISA Section 502(g)(2)(A) and the Collection Procedures, Defendant owes the IPF and IMI $32,484.29 in delinquent contributions and estimated delinquent contributions for work performed during the time period June 2005 through January 2008.

17.     As provided for in ERISA Section 502(g)(2)(B) and the Collection Procedures, Defendant is obligated to pay the IPF and IMI $2,123.97 in interest on such

delinquent contributions, calculated at the rate of 15 percent per annum from the Due Date through February 25, 2008.

18.    As additionally provided for in ERISA Section 502(g)(2)(C)(ii) and the Collection Procedures, Defendant is obligated to pay the IPF and IMI $5,207.35 in liquidated damages on such delinquent contributions, calculated from the Due Date at the rate of 20 percent.

19.    The court fee of $350.00 for filing this action is recoverable under ERISA Section 502(g)(2)(D) and the terms of the Collection Procedures.

20.    The process server's cost of $166.85 for serving the summons and Complaint is recoverable under ERISA Section 502(g)(2)(D) and the terms of the Collection Procedures.

21.    Attorney's fees of $2,143.00, which are recoverable under ERISA Section 502(g)(2)(D) and the terms of the Collection Procedures, have been incurred by the Plaintiffs in their attempt to collect delinquent contributions, estimated delinquent contributions, interest and liquidated damages due from Defendant.  An accounting of the attorney's fees incurred in this action is presented in the Declaration of counsel to the IPF, which accompanies this Motion for Default Judgment.

22.    The total amount owed the IPF and IMI by Defendant in delinquent contributions for work performed during the time period June 2005 through January 2006, and in estimated delinquent contributions for work performed during the time period April 2007 through January 2008, interest on such delinquent contributions and estimated delinquent contributions owed the IPF and IMI (calculated at the rate of 15 percent per annum), liquidated damages (calculated at the rate of 20 percent) on such delinquent contributions and estimated

2389157.01

delinquent contributions owed the IPF and IMI, Court filing fee, process server's fee and attorney's fees is $42,475.46.

      23.     Accordingly, Defendant owes Plaintiffs a total of $42,475.46.

     I declare under penalty of perjury that the foregoing is true and correct.

Date: _____March 4.____, 2008

_____
David F. Stupar
Executive Director

6

Attachment 1

5/13/02

### GENERAL COLLECTION PROCEDURES OF
### THE CENTRAL COLLECTION UNIT OF
### THE BRICKLAYERS AND ALLIED CRAFTWORKERS

These General Collection Procedures govern the collection of delinquencies by the Central Collection Unit of the Bricklayers and Allied Craftworkers ("CCU") on behalf of the following participating entities: Bricklayers and Allied Craftworkers International Union ("BAC"); Bricklayers and Trowel Trades International Pension Fund ("IPF"); Bricklayers and Allied Craftworkers International Health Fund ("IHF"); International Masonry Institute ("IMI"); Bricklayers and Allied Craftworkers Political Action Committee ("BACPAC"); and Local Officers and Employees Pension Fund ("LOEPF") (collectively "CCU Entities"). IHF and BAC SAVE are covered by Special Collection Procedures. Such Special Collection Procedures shall control when in conflict with these General Procedures.

I.     REPORTS AND PAYMENTS TO CCU ENTITIES

    A.     Due Date

        1.     Contributions and reports to the CCU Entities are due on or before the 15th day of the month following the month for which the contributions are being paid ("Due Date"), unless the collective bargaining agreement imposes a different Due Date.

        2.     Reports of participating employers must be filed each month even if no contributions are due for that month. All participating employers, whether submitting contributions directly or through a local administrator or local union, must use the standard CCU report form.

        3.     Employer reports will be date-stamped on the day received in the CCU Office, or in the case of local administrators or local unions, on the day received by the local. The stamped date will be the controlling date with regard to these Collection Procedures.

        4.     If any controlling date under these Collection Procedures falls on a weekend or legal holiday, the applicable date will be the next working day.

DSMDB-1449336v01

5.    The IPF is authorized by other CCU Entities to act on their behalf in litigation.  All references to "CCU Office" in these Collection Procedures may also refer to "IPF Office," as applicable.

B.    Notice Of Delinquency

1.    If the CCU Office has not received payment by the last day of the month of the Due Date, the CCU Office will send a Reminder Notice to the employer.  If payment has not been received 30 days after the Reminder Notice, a Notice of Delinquency will be sent to the employer.

2.    The Notice of Delinquency will advise the employer that required contributions were not received by the Due Date and warn that if the contributions are not received within 15  days (60  days following the Due Date), the employer will be considered delinquent ("Delinquent Date") and will be assessed interest at 15% per annum (retroactive to the Due Date) and may be required to pay Liquidated Damages of 20% of the delinquent amount.  The Notice of Delinquency will require the employer to notify the CCU Office within five (5)  days of the date of notice if the employer believes that the Notice of Delinquency was sent in error.

C.    Notice Of Referral To Counsel

1.    If the CCU Office has not received payment within 15  days of the Notice of Delinquency, the CCU Office will send to the employer a Notice of Referral to Counsel.

2.    The Notice of Referral to Counsel will advise the employer that payments were not received by the Delinquent Date and that payments for contributions and interest are due and owing.  Unless all sums owed are received by the CCU Office within 10 days following the Notice of Referral to Counsel, liquidated damages up to 20%  of the delinquent contributions or statutory interest may be imposed and the matter automatically will be referred to counsel.  The Notice of Referral to Counsel also will state that counsel will be instructed to seek all sums recoverable, including contributions, interest, liquidated damages or statutory interest, and all attorneys' fees.

2

II.     COUNSEL

    A.     Procedures

        1.     If CCU has not received the contributions and applicable interest within 10 days of the Notice of Referral to Counsel, the matter automatically will be referred to counsel no later than 15 days from the due date.

        2.     Within 10 days of referral, counsel will send a letter to the employer advising that if payment of contributions, interest and other damages is not received within 10 days, suit will be instituted.

        3.     Suit thereafter will be instituted.

    B.     CCU Policy Following Referral To Counsel

        1.     Following the referral of a matter to counsel, the CCU Office will have no authority to deal with an employer except to discuss computations.

        2.     Counsel shall file suit for all moneys recoverable, including damages that may be recoverable under Section 502(g)(2) of ERISA and also may seek remedies under applicable state law against individual corporate officers and/or shareholders.

        3.     The CCU is authorized to seek legal redress prior to the time that the above procedures are exhausted if, in his sole discretion, the Director concludes that the interests of affected participants require immediate action. If an employer fails to make payment when due, suit may be filed to collect all delinquent contributions, interest and other damages regardless of other exhaustion requirements in these Collection Procedures.

III.     AUDITS

    Audits will be conducted to insure full compliance with employer obligations under collective bargaining agreements. Every employer can expect to be audited at some time. If a delinquency is discovered as the result of an audit, the employer will be assessed the cost of the audit.

1449336 v1; V2BC01!.DOC

DSMDB-1449336v01

A.    Detection Of Delinquent Employers Subject To Audit

    1.    At least once every year, the Executive Directors of the IPF and IHF will send information to participants reflecting contributions received from participating employers. The participants will be encouraged to report missing hours to the CCU.

    2.    The CCU will take steps to insure that delinquencies of participating employers are recovered.

B.    Audits Performed By Third Parties

    1.    The CCU will rely upon audits performed by third parties when CCU determines that they conform to auditing procedures contained in the CCU's Guidelines.

    2.    The CCU periodically will monitor the audits of third parties in order to confirm their reliability.

C.    Audits Performed On Employers Contributing Directly To The CCU

    1.    The CCU will coordinate with third parties who perform audits on employers contributing directly to CCU and will insure that such audits conform to CCU guidelines.

    2.    As to employers contributing directly to the CCU who are not subject to audits by third parties, CCU will perform two types of payroll audits on directly contributing employers in order to insure compliance.

        a.    <u>Random Audits</u> -- Audits may be conducted on any participating employer at any time, on a random basis, at the direction of the Director.

        b.    <u>Problem Audits</u> -- When the Director receives information from a local union, covered member or other source indicating that an employer may be delinquent, the Director may order that an audit be conducted.

D.    Notification Of Audit Delinquency

    1.    The CCU Office will send a Notice of Delinquency to audited employers found to be delinquent stating the amount of additional contributions owing as a result of the audit.

    2.    Any unsatisfied audit deficiency will be treated according to the CCU's Collection Procedures following the intervention of counsel.

4

E.   Form of Audits

1.   All audits will be carried out under procedures formulated by the Director.

2.   All employer books and records set forth in the audit procedures will be made available to the CCU auditor.

IV.   BONDS

The Director may, in his sole discretion, require an employer to post a cash or surety bond in an amount and under terms necessary to protect the interests of the applicable CCU Entity.

Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al., ) <br><br> Plaintiffs, ) <br><br> v. ) <br><br> LMR CONSTRUCTION CO., INC., ) <br><br> Defendant. ) | Civil Action No. 07-1676 (RMC) |

## DECLARATION OF IRA MITZNER IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

Pursuant to 28 U.S.C. § 1746, I, **IRA R. MITZNER**, hereby declare as follows:

1.     I am a partner with the firm of Dickstein Shapiro LLP and the counsel of record for the Plaintiffs John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H.J. Bramlett, Eugene George, Paul Songer, Charles Verlardo, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent Delazzero, and Benjamin Capp ("IPF"), and Jim Allen, Matthew Aquiline, Lon Best, James Boland, Ted Champ, Raymond Chapman, Vincent Delazzero, Bruce Dexter, John Flynn, Eugene George, Gregory Hess, Fred Kinateder, Dan Kwiatkowski, Ken Lambert, Santo Lanzafame, Dick Lauber, William McConnell, Edward Navarro, Gerald O'Malley, John Phillips, Charles Raso, Mark Rose, Kevin Ryan, Gerard Scarano, Michael Schmerbeck, Paul Songer, Joseph Speranza and Fred Vautour, ("IMI"), in the above-captioned case.  I have personal knowledge of the facts stated herein and, if called to testify as a witness, I could and would competently testify as set forth below.

2.     On November 13, 2007, service of process was effected upon Defendant and a Declaration in Support of Service of Summons and Complaint was filed with the Court on December 10, 2007.

3.    As of this date, no answer to the Complaint has been filed by Defendant.

4.    As set forth in the accompanying Declaration of David F. Stupar, Defendant owes the following sums to Plaintiffs:

$ 32,484.29    Contributions and estimated contributions due to the IPF and IMI for work performed in the jurisdiction of Local 46 OH

$ 2,123.97    Interest payable on above known and estimated delinquent contributions due to the IPF and IMI, calculated at the rate of 15 percent per annum from the Due Date through February 25, 2008

$ 5,207.35    Liquidated Damages at the rate of 20 percent, assessed on above known and estimated delinquent contributions due the IPF and IMI

$ 350.00    Filing fee (for U.S. District Court)

$ 166.85    Process Server's fee

$ 40,332.46    Amount Due the IPF and IMI by Defendant for unpaid contributions, interest, liquidated damages, court fees and service of process fees

5.    Additionally, the Employee Retirement Income Security Act of 1974 ("ERISA") provides for the mandatory award of attorney's fees. ERISA Section 502(g)(2)(D). Plaintiffs' counsel has charged the Fund less than the firm's market rate in this matter for well-intentioned, public-spirited reasons. Counsel for Plaintiffs has offered this reduced fee in order to mitigate financial hardships to the Fund, which provides retirement benefits to members of the International Union of Bricklayers and Allied Craftworkers. We believe that our efforts help to ensure the viability of the Fund and, in turn, the welfare of those participants and beneficiaries who depend on their pensions for income after retirement.

2

6.    Counsel for the Funds, consistent with the decision of the United States Court of Appeals for the District of Columbia Circuit in *Board of Trustees of the Hotel and Restaurant Employees Local 25 and Employers' Health and Welfare Fund v. JPR, Inc.*, 136 F.3d 794, 800-808 (D.C. Cir. 1998), on remand, 1999 WL 1567733 (D.D.C Sept. 10, 1999), and for the reasons set forth in paragraph 5 above, therefore seeks to recover counsel's market rates in this action rather than the reduced fee charged to the Fund.

7.    Ira R. Mitzner is a partner with the firm of Dickstein Shapiro LLP and the counsel of record for the Plaintiffs, John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H.J. Bramlett, Eugene George, Paul Songer, Charles Verlardo, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent Delazzero and Benjamin Capp ("IPF"), and Jim Allen, Matthew Aquiline, Lon Best, James Boland, Ted Champ, Raymond Chapman, Vincent Delazzero, Bruce Dexter, John Flynn, Eugene George, Gregory Hess, Fred Kinateder, Dan Kwiatkowski, Ken Lambert, Santo Lanzafame, Dick Lauber, William McConnell, Edward Navarro, Gerald O'Malley, John Phillips, Charles Raso, Mark Rose, Kevin Ryan, Gerard Scarano, Michael Schmerbeck, Paul Songer, Joseph Speranza and Fred Vautour, (IMI"), in the above-captioned case.

8.    Mr. Mitzner has been in practice for thirty-five years and is the author of the book, *ERISA Litigation: A Basic Guide,* which contains a chapter on collection of employer delinquencies. He has spoken and written on the collection of employer delinquencies since ERISA was enacted in 1974. Mr. Mitzner has been inducted as a Fellow of the American College of Employee Benefits Counsel, an organization that is limited to lawyers with over 20 years of experience who demonstrate excellence in the quality of their practice and who seriously contribute to the public's understanding and appreciation of employee benefits. He has been counsel of record in some of the leading ERISA cases involving collection of employer delinquencies under ERISA in the District of Columbia, including *Flynn v. Dick Corp.*, 481 F.3d 824, 831 (D.C. Cir. 2007); *Flynn v. Ohio Building Restoration, Inc.*, 317 F. Supp. 2nd 22 (D D.

3

C. 2004), *appeal dismissed,* No. 04 CV 7091 (2005 U.S. App. LEXIS 12794 (D.C. Cir. June 27, 2005); *Flynn v. R.C. Tile,* 353 F.3d 953 (D.C. Cir. 2004); *Joyce v. Clyde Sandoz Masonry,* 871 F.2d 1119 (D.C. Cir.), *cert denied,* 493 U.S. 918 (1989); and *Joyce v. Silveri,* 66 F. Supp. 2d 1 (D.D.C. 1999). The hourly rate charged by the Firm for Mr. Mitzner's services reflects his expertise and extensive experience in ERISA litigation.

9.      Claudette Elmes has been employed as a paralegal with the firm of Dickstein Shapiro for more than twenty years and has assisted Mr. Mitzner in that capacity with collection litigation pursuant to ERISA for the past ten years. Ms. Elmes obtained a paralegal certificate in 1988 and a JD in 1995 from the George Washington University. The hourly rate charged by the Firm for the services of Ms. Elmes is commensurate with her educational background and many years of experience in the paralegal field.

10.     The fees incurred in this action to date, calculated according to the normal billing rates for Dickstein Shapiro LLP in effect currently or at the time services were performed for IPF matters, are as follows:

|  | Hours | Per Hour | Total |
|---|---|---|---|
| Ira R. Mitzner (Partner) | 30 .50 | $535.00 585.00 | $   160.50 292.50 |
| Claudette Elmes (Paralegal) | 2.00 6.00 | $200.00 215.00 | $   400.00 1,290.00 |
| **Total** | **8.80** |  | **$2,143.00** |

11.     The default of Defendant for failure to answer was entered by the Clerk of this Court on December 11, 2007.

DSMDB-2389607v01

12.    We therefore pray for entry of default in favor of Plaintiffs in the total amount of $42,475.46.

I declare under penalty of perjury that the foregoing is true and correct.

Date: March ___5___, 2008

Ira R. Mitzner

5

Exhibit C

Default - Rule 55A (CO 40 Revised-DC 02/00)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN FLYNN, et al.

_____

Plaintiff(s)

Civil Action No. 07-1676 (RMC)

v.

LMR CONSTRUCTION CO., INC.

_____

Defendant(s)

RE: LMR CONSTRUCTION CO., INC.

### DEFAULT

It appearing that the above-named defendant(s) failed to plead or otherwise defend this action

though duly served with summons and copy of the complaint    on    November 13, 2007    , and an

affidavit on behalf of the plaintiff having been filed, it is this 11th day of December , 2007 declared

that defendant(s) is/are in default.

NANCY MAYER-WHITTINGTON, Clerk

By: _____

Deputy Clerk

Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN FLYNN, JAMES BOLAND, GERALD O'MALLEY, KEN LAMBERT, GERARD SCARANO, H. J. BRAMLETT, EUGENE GEORGE, PAUL SONGER, WILLIAM MCCONNELL, MATTHEW AQUILINE, GREGORY R. HESS, MICHAEL SCHMERBECK, VINCENT DELAZZERO, and BENJAMIN CAPP, as Trustees of, and on behalf of, the BRICKLAYERS & TROWEL TRADES INTERNATIONAL PENSION FUND, <br><br>    620 F Street, N.W. <br>    Washington, DC 20004 <br>    (202) 783-3788, <br><br>    and <br><br> JIM ALLEN, MATTHEW AQUILINE, LON BEST, JAMES BOLAND, TED CHAMP, RAYMOND CHAPMAN, VINCENT DELAZZERO, BRUCE DEXTER, JOHN FLYNN, EUGENE GEORGE, GREGORY HESS, FRED KINATEDER, DAN KWIATKOWSKI, KEN LAMBERT, SANTO LANZAFAME, DICK LAUBER, WILLIAM MCCONNELL, EDWARD NAVARRO, GERALD O'MALLEY, JOHN PHILLIPS, CHARLES RASO, MARK ROSE, KEVIN RYAN, GERARD SCARANO, MICHAEL SCHMERBECK, PAUL SONGER, JOSEPH SPERANZA, and FRED VAUTOUR as Trustees of, and on behalf of, the INTERNATIONAL MASONRY INSTITUTE, <br><br>    620 F Street, N.W. <br>    Washington, DC 20004 <br>    (202) 783-3788, <br><br>                    Plaintiffs, <br>                    v. <br><br> LMR Construction Co., Inc. <br> 13271 Bass Lake Road <br> Chardon, OH 44024, <br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case: 1:07-cv-01676<br>Assigned To : Collyer, Rosemary M.<br>Assign. Date : 9/21/2007<br>Description: Labor-ERISA<br><br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

Plaintiffs, by their attorneys, DICKSTEIN SHAPIRO LLP, complaining of the Defendant, allege as follows:

## CAUSE OF ACTION
### Jurisdiction and Venue

1.    This is an action brought by the fiduciaries of the Bricklayers & Trowel Trades International Pension Fund ("IPF" or "Fund"), and the fiduciaries of the International Masonry Institute ("IMI") to enforce the terms of the Plan and Trust Agreements adopted by the IPF and IMI, and the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). This action arises under the laws of the United States, specifically Section 502(a)(3), 502(g)(2), and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3), 1132(g)(2), 1145. Pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), jurisdiction is therefore conferred on this Court as to the claims brought on behalf of the IPF and IMI.

2.    The IPF and IMI are administered in the District of Columbia. Venue for the claims asserted by the IPF and IMI is conferred on this Court pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), which provides:

> (2) Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

### Parties

3.    Plaintiffs, John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H. J. Bramlett, Eugene George, Paul Songer, William McConnell, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent DeLazzero and Benjamin Capp, are Trustees of, and sue on behalf of, the IPF. The IPF is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning

2

of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). The IPF trustees bring this action on behalf of, and for the benefit of, the beneficiaries of the IPF in their respective capacities as fiduciaries.

4.    The IPF is also authorized to effect collections on behalf of the IMI, pursuant to a written Assignment of Claims and the *Collection Procedures of the Central Collection Unit of the Bricklayers and Allied Craftworkers* ("Collection Procedures").

5.    Plaintiffs, Jim Allen, Matthew Aquiline, Lon Best, James Boland, Ted Champ, Raymond Chapman, Vincent Delazzero, Bruce Dexter, John Flynn, Eugene George, Gregory Hess, Fred Kinateder, Dan Kwiatkowski, Ken Lambert, Santo Lanzafame, Dick Lauber, William McConnell, Edward Navarro, Gerald O'Malley, John Phllips, Charles Raso, Mark Rose, Kevin Ryan, Gerard Scarano, Michael Schmerbeck, Paul Songer, Joseph Speranza and Fred Vautour, are Trustees of, and sue on behalf of the IMI. The IMI is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). The IMI trustees bring this action on behalf of, and for the benefit of, the beneficiaries of the IMI in their respective capacities as fiduciaries.

6.    Defendant, LMR Construction Co., Inc. ("LMR Construction" or "Defendant") is, and at all times hereinafter mentioned was, a company maintaining offices and conducting business in the state of Ohio.

7.    Defendant employs or has employed members of the International Union of Bricklayers and Allied Craftsmen and its affiliated local unions ("Union").

3

2293627.01

## Violation Charged

8.    LMR Construction, acting through its authorized agents or officers, executed a collective bargaining agreement with the Union.    That collective bargaining agreement is annexed hereto as Exhibit A and is hereinafter referred to as the "Agreement."

9.    Pursuant to the Agreement, Defendant agreed to make certain payments to the IPF and IMI on behalf of covered employees of Defendant.

10.    Having submitted some contributions, Defendant has demonstrated an awareness of the obligation to make those payments.

11.    Defendant has failed to properly submit contributions to the IPF for work performed pursuant to the Agreement.

12.    Based on a Recap prepared by the IPF of monthly reports submitted by LMR Construction, Defendant owes the IPF and IMI contributions in the amount of $15,612.87 for work performed during the months of October 2006 through March 2007.

13.    Under the terms of the Plan and Trust Agreements adopted by the IPF and IMI, interest in the amount of $1,360.89 calculated from the Due Date at the rate of 15 percent per annum and liquidated damages in the amount of $3,044.22 at the rate of 20 percent have been assessed on such delinquent contributions due the IPF and IMI work performed during the months of October 2006 through March 2007.

14.    In addition, Defendant failed to submit reports and/or contributions to the IPF for work performed pursuant to the Agreement during the months of April 2007 through August 2007.    Accordingly, Plaintiffs have been forced to estimate the amount of contributions due the IPF and IMI for work performed during this time period.

4

15.    Defendant is estimated to owe the IPF and IMI contributions in the amount of $13,587.58 for work performed during the months of April 2007 through August 2007.

16.    Under the terms of the Plan and Trust Agreements adopted by the IPF and IMI, interest in the amount of $308.20 calculated from the Due Date at the rate of 15 percent per annum and liquidated damages in the amount of $1,608.13 at the rate of 20 percent have been assessed on such estimated delinquent contributions due the IPF and IMI for work performed during the months of April 2007 through August 2007.

17.    Plaintiffs have brought this action in faithful performance of the fiduciary duties imposed upon them under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1). Plaintiffs have been, and are, incurring additional attorney's fees as a direct result of Defendant's failure to make contributions in accordance with the terms and conditions of the Agreements.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.  For the total amount of $35,871.89, which is constituted as follows:

a.  For delinquent contributions and estimated delinquent contributions in the amount of $29,200.45 payable to the IPF and IMI for work performed during the time period July 2006 through August 2007, plus any and all additional amounts found to be due and owing through the date of judgment (ERISA Section 502(g)(2)(A); Collection Procedures);

b.  For interest in the amount of $1,669.09 assessed on such unpaid contributions and estimated contributions due the IPF and IMI, calculated at 15 percent per annum from the Due Date (ERISA Section 502(g)(2)(B); Collection Procedures);

c.  For liquidated damages in the amount of $4,652.35 assessed on such unpaid contributions, calculated at 20 percent (ERISA Section 502(g)(2)(C)(ii); Collection Procedures);

5

2293627.01

d. For the costs of filing this action in the amount of $350.00 (ERISA Section 502(g)(2)(D));

2. In the amount of Five Thousand Dollars ($5,000.00), and such additional amounts as may be incurred, representing attorney's fees and costs of this action (ERISA Section 502(g)(2)(D)).

3. That Defendant be directed to comply with its obligations to submit all required reports and to make all contributions due and owing to the IPF and IMI and to pay the costs and disbursements of this action.

4. Such other relief as this Court deems appropriate, including judgment for any contributions and interest thereon that may accrue subsequent to the filing of this complaint, as well as any resulting statutory damages thereon under ERISA.

Date: September __21__, 2007    By:_____

Ira R. Mitzner, DC Bar No. 184564
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006
(202) 420-2200

Attorneys for Plaintiffs

6

EXHIBIT A

RECEIVED JUL 2 7 1992

A

OH9264

# AGREEMENT

*between*

## INTERNATIONAL UNION OF

## THE BRICKLAYERS
## AND
## ALLIED CRAFTSMEN
## LOCAL UNION NO. 46

*and*

## THE LABOR RELATIONS DIVISION
*OF THE*

## OHIO CONTRACTORS ASSOCIATION

## The Associated General Contractors

## of America, Inc.



**Termination - May 31, 1995**

# EMPLOYERS

## THE LABOR RELATIONS DIVISION

## BUILDING SECTION

## OHIO CONTRACTORS ASSOCIATION

1313 Dublin Rd.
P.O. Box 959
Columbus, OH 43216

Tom Hitchings
Manager, Labor Relations

614-488-0724
1-800-282-1388

# INDEX

| Article | | Page |
|---|---|---|
| | Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| I | Craft Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 - 3 |
| II | Union Representation and Hiring . . . . . . . . . . . . . . . . . . . . . | 3 |
| III | Working Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 - 4 |
| IV | Working Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 - 5 |
| V | Hours of Work, Pay Day, Reporting and Overtime Provisions . . . . . . . . . . . | 5 |
| VI | General Working Code and Conditions . . . . . . . . . . . . . . . . . . . . . . | 6 |
| VII | Firebrick Working Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 - 7 |
| VIII | Apprentices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 |
| IX | Fringe Benefit Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 - 8 |
| X | Jurisdictional Disputes, Grievance Procedure and Arbitration . . . . . . . . . . . | 8 - 9 |
| XI | Cement Masons Work Covered and Working Conditions . . . . . . . . . . . . . . . | 9 - 10 |
| XII | Construction Advancement Program of North Central and East Central Ohio . . . . . . . . . . . . . . . . . . . . . | 10 - 11 |
| XIII | Savings and Separability . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 |
| XIV | Conflicting Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 |
| XV | Duration of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 |
| | Appendix A — | |
| | Rates of Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 - 12 |
| | Assent - Company, LRD, Union . . . . . . . . . . . . . . . . . . . . . . . . . | 13 - 15 |

## AGREEMENT

(1)    This Agreement, made and entered into by and between the Labor Relations Division of the Ohio Contractors Association, The Associated General Contractors of America, Inc., hereinafter called the "CONTRACTOR", and the I.U. of B. & A.C., which includes Local Unions 46, hereinafter called the "UNION", to define and agree to the conditions and wages under which the employees shall work, and to define all classifications of work and to prevent strikes or lockouts and adjust grievances in a peaceful and dignified manner.

(2)    It if specifically understood that said Labor Relations Division of the Ohio Contractors Association, The Associated General Contractors of America, Inc., and it Negotiating Committee shall not be liable hereunder for any reason whatsoever, including, but not limited to, any acts of its subscribing members.

(3)    It is further agreed and understood that the liabilities of the contractors subscribing hereto and the Local Unions subscribing hereto shall be several and not joint.

(4)    The Labor Relations Division of the Ohio Contractors Association, The Associated General Contractors of America, Inc., agrees to furnish to the Union a list of all its members subscribing to the terms of the Agreement.

(5)    The Labor Relations Division of the Ohio Contractors Association, The Associated General Contractors of America, Inc., recognizes the Local Unions as the sole and exclusive bargaining Agent for all of its members with respect to wages, hours and other terms and conditions of employment on any and all work described herein.

(6)    Likewise, the I.U. of B. & A.C. Local Unions recognize the Labor Relations Division of the Ohio Contractors Association, The Associated General Contractors of America, Inc., as the sole bargaining agent for work defined herein for the several areas outlined. This Agreement shall cover and be binding on all of the said members of, and contractors and employers in the construction industry affiliated with the Labor Relations Division of the Ohio Contractors Association. The Associated General Contractors of America, Inc., or individual employers signatory hereto.

(7)    The Union may extend this Agreement, without alteration or deletion of any provision or terms, to Contractors who are not members of the Labor Relations Division of the Ohio Contractors Association, The Associated General Contractors of America, Inc., and such Contractors shall be bound by all terms and provisions of this Agreement. The Union shall notify the OCA-LRD of any such Contractors who become signatory to the Agreement. Such Contractors will be referred to as the "CONTRACTOR".

(8)    The provisions of this Agreement shall govern the employment of and conditions under which employees shall work and rates of pay they shall receive on work as defined herein for the following Ohio counties:

| Local Union | Ohio Counties |
|---|---|
| 46 Fremont | Erie, Hancock, Huron, Ottawa, Sandusky, and Seneca. The Islands of Lake Erie north of Sandusky, the Townships of Tymochtee, Crawford, Ridge and Richland in Wyandot County, the Townships of Perry and Bloom in Wood County. |

(9)    All employers or masonry contractors who employ members of the I.U. of B., & A.C. shall be required to register with the Local Union and will present to the Union the following information in good order and up-to-date prior to entering this jurisdiction:
1. Ohio Workmen's Compensation
2. Ohio Unemployment Compensation

3. Employer's Registration or Identification Number
4. A Surety Bond in the amount of $5,000 to insure the Member's Payroll

If the four items above mentioned are not in good order and do not satisfy the Union as to their validity, the Contractor shall not be registered, in which case the members are forbidden to work for such Contractor or Employer.

## ARTICLE I

### CRAFT JURISDICTION

(10)  **BRICKLAYING** — Laying of all brick, caulking, pointing, and the final cleaning of all masonry, the cutting, grinding and rubbing of all kinds of brick when the work is performed on the job, the cutting of any opening up to 40 sq. feet, the cutting out of all masonry that will be replaced by masonry or substitute for masonry, will be done by the Bricklayer, cutting of chases two (2) inch or less which can be cut by other trades for use in the connection with their work is not to exceed four (4) hours time setting of all cutstone, the laying of all rubble work with or without mortar, the cutting, setting of cement blocks or artificial stone, the cutting, setting, pointing and cleaning of terracotta before being placed on the wall, all plastering of exterior wall below grade, arch tile floors and tile fireproofing of structured steel, mineral wool, cork block styrofoam, Boyardi tile, the tuck pointing and setting and grouting of all wood plates, bearing plates and any other material set in mortar or cement or any other type of cement, or substitutes for the above mentioned material.

The cutting, setting, cleaning and pointing of concrete slabs whether used for walls, floors, or ceilings or retaining walls, of all widths and sizes and weights, regardless of who makes the slabs or whatever patented name the slabs may be called. The caulking, grouting, pointing and cleaning of all precast slab regardless if they are set in mortar or welded to steel or anchored other ways shall also be the work of the Bricklayer. If a composite crew is used, Bricklayers shall be on it.

Pointing, cleaning, caulking shall consist of the pointing, cleaning, caulking of all types of masonry precast slabs, etc., the caulking of all window frames, door frames or apertures incased in masonry, brick, stone or concrete structures, including all grinding and cutting out of such work and all sand blasting, steam cleaning and gunnite work. The pointing, cleaning and weather-proofing of all buildings, grain elevator and chimneys built of stone, brick or concrete, it shall include all cutting out, sandblasting and gunnite work on same. Cleaning is defined as rubbing walls, tile brick and block, also washing down with soap or other cleaning solution.

The Bricklayer shall caulk all openings and expansion joints that are built in masonry walls and all abutting units.

The Bricklayers shall fill in all masonry walls with mortar, vermiculite or other insulating materials, and concrete or sand at the Contractor's option. The Bricklayer shall install against masonry walls clips or fasteners which are to receive insulating materials normally installed by the Bricklayer. The Bricklayer may also use epoxy to install masonry units and to attach the aforementioned clips or fasteners. The grouting of all precast, pointing of precast, the puddling of all refractories and the pointing of coolers (blast furnaces) is the work of the Bricklayer.

The installation and erection, including the cutting, fitting, bedding, pointing, caulking, patching, grouting, plumbing, aligning, leveling and anchoring, including bolting and welding of any type of fabricated or pre-fabricated brick, block or stone masonry units when installed in a masonry bearing building shall be exclusive work of the members of the International Union of Bricklayers and Allied Craftsmen. The units referred to here shall be fabricated by Bricklayers, members of the I.U. of B & A.C.

— 1 —

(11)  **STONE MASONRY** — Stone masonry shall consist of laying all rubble work, with or without mortar, setting of all cut stone, marble, slate or stone work (meaning as to stone, any work manufactured from such foreign or domestic products as are specified and used in the interior or on the exterior of building by architects, and customarily called stone in the trade.)

Cutting all shoddies, broken ashler or random ashler that is roughly dressed upon beds and joints, and range ashler not over ten (10) inches in height, the dressing of all jambs, corners and ringstones that are roughly dressed upon the beds, joints or reveals, and the cutting of a draft upon same for plumbing purposes only, and the cleaning and pointing of stone work, this is to apply to all work on building sewers, bridges, railroads, or other public works, and to all kinds of stone, particularly to the products of the locality where the work is being done, and the same shall be considered stone masonry. Stone masons shall have the right to use all tools necessary in the performance of their work.

(12)  **ARTIFICIAL MASONRY** — The cutting, setting and pointing of cement blocks, brickcretes, cement brick and any other concrete product used in the exterior or interior of buildings when set by the usual customs of the journeymen mechanics, and the controller of all substitute materials for the clay or stone products used in the backing up of external walls, the building of party walls, columns, girders, beams, floors, stairs and arches and the plastering of all external walls to grade with cement plaster and any building being constructed or repaired.

The Bricklayer shall drill all holes in the masonry unit missed in the prefabrication of the masonry unit. The Bricklayer shall do all work required to anchor masonry units when done on the job site. The Bricklayer may use power tools in the performance of his duties. Welding torches are tools of the trade and shall not be limited to any single craft. Equipment shall be provided for by the employer.

(13)  **TILE LAYERS** — The laying or setting of all tile where used for floors, walls, ceiling walks, promenade roofs, stair treads, stair risers, facings, hearths, fireplaces, and decorative inserts, together with any marble plinths, thresholds or window sills, or stools used in connection with any tile work, also prepare and set all concrete, cement, brickwork or other foundation or materials that may be required to properly set and complete such work; the setting or bedding of all tiling, stone, marble, composition, glass, mosaic, or other materials forming the facing hearth or mantle of a fireplace, or the mantle complete, together with the setting of all cement. brickwork or other material required in connection with the above work; also the slabbing and fabricating of tile mantles, counters and the tile panels of every description and the erection and installation of same. The building, shaping, forming, construction or repairing of all fireplace work, whether in connection with a mantle, hearth, or facing or not, and the setting and preparing of all materials such as cement, plaster, mortar, brickwork, iron work, or other materials necessary for the proper and safe construction and completion as such work, except that a mantle made exclusively of brick, marble or stone, shall be conceded to the bricklayers, marble setters, or stone mason, respectively.

It will be understood that the word "tile" refers to all burned clay products as used in the tile industry, either glazed or unglazed and to all composition materials made in single units up to 15" x 20" x 2", except quarry tiles larger than 9" x 9" x 1¼", also to mixtures in tile form of cement that are made for and intended for use as a finished floor surface, whether upon interior or exterior floors, stairs, promenade roofs, garden walks, interior walls, ceilings, swimming pools, and all places where tile may be used to form a finished surface for practical use, sanitary finish or decorative purposes, for setting all accessories when built in walls, or for decorative inserts in other materials.

(14)  **MARBLE MASONS** — Marble masons jurisdiction claims shall consist of the carving, cutting, setting of all marble, slate, stone, alberneen, semionyx, vitrolite and similar opaque glass, scagiola, marbleithis and all artificial imitation or cast of whatever thickness or dimensions. This shall apply to all interior work, such as sanitary, decorative and other purposes inside buildings of every description whenever required, including all polish, bones or sand finish; also the cutting and fitting of above materials after same leave mills or ship, and the laying of all marble tile, slate tile and terrazzo tile. Foreman over any marble masonry shall be marble setters, and no time shall anyone other than marble masons be a foreman.

(15)  **MOSAIC AND TERRAZZO WORKERS** — Marble Mosaic, venetian enamel and terrazzo, the cutting and assembling of art ceramic, glass mosaic, the casting of all terrazzo in shops and mills. All scratch coat on walls and ceilings, where mosaic and terrazzo is to be applied shall be done by plasters, with an allowance of not less than one-half inch bed to be conceded to mosaic and terrazzo workers. All bedding above concrete floors or walls, that the preparation laying or setting of metal or wooden strips and grounds, where terrazzo workers. All terrazzo finished (rustic) or rough washed for interior or exterior of buildings, or any substitute that is applied under the same method as mosaic or terrazzo shall be set by mosaic or terrazzo workers. Cutting and assembling of art ceramic and glass mosaic comes under jurisdiction of the mosaic workers and the setting of same shall be done by the tile setters.

(15A)  **MECHANIC'S HELPERS** — Mechanic's helpers shall do all handling of sand, cement, lime, tile, marble, terrzzo and all other materials that may be used by the tile, mosaic, marble and terrazzo mechanics upon being delivered to the building or at the job, hand rubbing, rolling, mixing, formulating, grinding, grouting, and cleaning all marble, tile, mosaic and terrazzo floors, and wainscoating, and such other work as is required in helping a mechanic as the established custom of the trade in the Constitution of the Helpers International Union. There shall be no limitation of tools, equipment, or machinery used.

On any job in the jurisdiction of Local No 46, Ohio the first helper on any job shall be from Local No. 46, Ohio, he shall be Steward and be appointed by Business Agent. Out of town contractors shall be allowed only one key man on each job.

On all jobs coming under the jurisdiction of this agreement the following ratio of mechanics to helpers shall be observed:

2 Mechanics - 1 Helper
3 Mechanics - 2 Helpers
4 Mechanics - 2 Helpers
5 Mechanics - 3 Helpers

On larger crews the foregoing ratio will be observed.

(16)  **PLASTERING** — All exterior or interior plastering, plain and ornamental when done with stucco, cement and lime mortars or patent substitutes or material, artificial marble work, when applied in plastic form, composition work in all its branches, the covering of all walls, ceilings, soffits, pier columns or any other part of construction of any sort when covered with any plastic material, in the usual methods of plastering is the work of the plasterer. The casting and sticking of all ornaments of plaster or plastic compositions, the cutting and filling of cracks. All cornices, moldings, coves, and bull noses shall be run in place on rods and white mortar screens and with a regular mold and all substitutes of any kind when applied in plastic form with a trowel or substitute for same, is the work of the plastered.

Any decision of the International Union covering artificial masonry, precast panels, nail-ons, etc. shall be incorporated in this agreement as part of the craft jurisdiction.

## ARTICLE II

### UNION REPRESENTATION AND HIRING

(17 )  **UNION SECURITY:** Subject to the provisions and limitations of the National Labor Relations Act, as amended, all present employees who are members of the Union on the effective date of this agreement shall continue their membership in the Union for the duration of this Agreement to the extent of paying an initiation fee and membership dues uniformly required as a condition of acquiring or retaining membership in the Union. All employees who are not members of the Union and all persons who hereinafter become employees shall become members of the Union if qualified, on the eighth (8th) day following the beginning of their employment or on the eighth (8th) day following the effective date of this Agreement, which ever is later, and shall remain a member of the Union, to the extent of paying an initiation fee and the membership dues uniformly required as a condition of acquiring or retaining membership in the Union whenever employed under and for the duration of this Agreement.

The Union may notify the Contractor in writing of any default on the part of an employee to pay his initiation fee and/or membership dues, and if the employee has not paid his initiation fee and/or membership dues within seven (7) days from the receipt of such written notice, the Contractor shall discharge such employee, provided membership was available under the same terms and conditions generally applicable to other members. Further, all employees who fail to maintain their Union membership as above provided, shall be discharged by the Contractor.

(18)  **STEWARD:** The Contractor shall acknowledge the Steward in the performance of his duties, and allow him reasonable time to carry out such duties.

The first Local Journeyman on the job shall be the Steward pending the selection of a Steward by the Business Agent. The Steward shall check all Union books.

The Steward, while serving as such, shall have "top" seniority rating. Stewards shall be given preference of employment and overtime as long as there is work available which he is capable of doing. He shall not be discharged or transferred without prior notice to the Union or the Business Agent.

The Steward shall have no authority to call a strike, slowdown of work, or perform any other act that would be in violation of this Agreement. He shall, however, be permitted to remove any members from a scaffold or job condition that is hazardous or unsafe.

The local Union Business Agents may consult with the Steward on the job or with any employee provided it does not unnecessarily interefere with the progress of work on the job. The Union Business Agent shall clear with representative of employer when visiting a job.

When a complete layoff occurs on a project, The Local Steward shall be the first employee called back when the job starts up again.

(19)  The Contractor agrees to hire (when available) seventy-five (75) percent of employees from the Local Union having jurisdiction over the project site. Foremen are not considered as part of this ratio. This ratio is meant for the benefit of Local member living in the local jurisdicton, reguardless of age, race creed, color, sex or national origin.

The Contractor does agree to give the Union at least twenty-four (24) hours notice when requesting new members to report for work.

No Employee shall work for any Contractor who is not in compliance with the Workman's Compensation Law of Ohio, the Unemployement Insurance Act and the applicable Federal Laws.

The Contractor and union shall not discriminate in hiring of employees and will conform to State and Federal Laws with respect to hiring. Any employee referred to the Contractor at the Contractor's request and then not put to work by the Contractor shall be paid reporting pay of two (2) hours.

It is a condition of this Agreement, agreed to by both the Union and the Contractor, to provide equal opportunity of employment for all qualified persons, and to prohibit discrimination in employment because of age, race, creed, color, sex or national origin. There shall be full compliance with all applicable Federal and State statutes, regulations, rules and orders of appropriate Federal and State agencies having jurisdiction over the subject matter of discrimination in employment.

(20)  **SUBCONTRACT PROVISION:** This Agreement shall bind all Subcontractors while working for a Contractor on the job site upon who, this Agreement is binding. Any Contractor who sublets any of his work must sublet that work subject to the terms and conditions of this Agreement.

(20a)  **TRAVELING CONTRACTORS:** When the Employer has any work specified in this agreement to be performed outside of the area covered by this agreement and within the area covered by an agreement with another affiltiate of the International Union of Bricklayers and Allied Craftsman, the Employer agrees to abide by the full term and conditions of the agreement in effect in the jobsite area. Employees covered by the agreement who are sent to projects outside of the area covered by this agreement shall be paid at least the established minimum wage scale specified in Appendix A of this agreement but in no case less than the established minimum wage scale of the local agreement covering the territory in which such work is being performed plus all contributions specified in the jobsite local agreement. The employer shall in all other matters be governed by the provisions established in the jobsite local agreement. If employees are sent to work on a project in an area where there is no agreement covering the work, the full terms and conditions of this agreement shall apply.

## ARTICLE III

### WORKING CONDITIONS

(21)  **PRE-JOB CONFERENCE:** It is agreed that upon request of either party a pre-job conference shall be held at least (5) days prior to the commencing of work. It is further agreed that the Union may request and hold a joint pre-job conference with the Contractor and/or Sub-contractor on an individual basis wherein the following items will be discussed:

A. The Contractor will advise the Local Union Representative of the Contractor's requirements of necessary employees in the classifications of work under this Agreement and the Local Union will determine and advise the Contractor of the ability of the Local Union to fulfill such requirements when requested to do so.

B. Work Schedules.

C. Questions of jurisdiction and assignment of work.

It is understood that no agreement may be made at the pre-job conference which will, in effect, change, modify or abrogate the Labor Agreement in effect between the two parties hereto.

(22)    The Union shall place no limitations upon the amount of work which an employee shall perform during the working day and there shall be no restrictions imposed against the use of any type of mechanics tools, applicances or labor saving devices. Materials or equipment may be secured from any market or source except for prison-made goods. The use of "corner-poles, speed leads or deadmen" is prohibited on commercial work.

(23)    **SPLIT CREW:** When the crew is split up with one gang working inside and one gang working outside, if inclement weather sets in, the outside gang shall come inside to work.

If any men are sent home for any reason, everyone shall be sent home.

If a crew is steadily employed prefabricating masonry units, they shall be permitted to continue working. If for any reason, the fabricating crew cannot work they may be sent home.

(24)    The steward shall call a ten (10) minute coffee break in the morning and a ten (10) minutes break in the afternoon.

(25)    The Steward or Business Agent shall be notified prior to the hiring of additional men on the job.

(26)    **FOREMEN:** Only journeymen bricklayer foremen shall give instructions to the bricklayers. Foremen must be members of I.U. OF B. & A.C.

When two journeymen are employed on a job, the Contractor shall designate one as Foremen and pay him as such.

Foreman Rate: To be 10% above journeymen scale.
The Foreman shall not work with his tools after six (6) men, including the foremen, are employed. He shall not raise or place lines in walls unless he is working on said wall. He may, however, instruct apprentices. Foreman shall be allowed to lay out work, with measuring and marking devices and tools.

It shall be the function of the Foreman to tell the employee what he wants done, how he wants it done and see that the work is properly done. He shall be responsible for the placing of the men, assigning their tasks and maintaining safe working conditions, planning and effective execution of the work.

Any employee including foremen, using insulting or abusive language to other employees on the project shall be in violation of the Agreement.

General Foreman: When an employer is working under any International Maintenance Agreement, the term General Foreman referred to in the Maintenance Agreement shall mean 20% of journeyman's rate as a premium.

(27)    The Contractor may discharge any employee, for just cause or failure to observe the safety precautions or other rules and regulations prescribed by the Contractor for the health, safety and protection of his employees. However, no employee shall be discharged for defending the rights of a fellow employee under the terms of this Agreement. No Steward will be discharged until a hearing is held between the Business Representative of the Union and the Contractors Representative to hear evidence of the circumstances surrounding the discharge.

(28)    **TRANSFER OF EMPLOYEES:** Employees covered by this Agreement may be offered the opportunity by the Contractor to accept employment on any other project of the Contractor within the individual local jurisdiction of this Agreement, but said employment, if accepted by the Employee, is subject to the terms and conditions of this Agreement.

(29)    The Contractor will abide by the Safety Code (I.C. - 3) of the State of Ohio and with applicable Federal Safety Regulations and it is further agreed that the employee will abide by such safety regulations.

(30)    Contractors are to furnish a suitable room or shanty for all employees use. Once the number of masons on a project exceed

4, ie. 5 or more, contractor to furnish suitable room or shanty for exclusive use of the employees covered by this agreement, with ample seating capacity and room for the keeping of their tools, clothing and eating their lunch. Said room or shanty shall be kept clean at all times and be heated when necessary from October 1st to May 1st. Where combustible fuels are used, all stoves shall have chimneys or flues. Necessary sanitary facilities, properly secluded, shall be provided for the members on all jobs. Contractors shall keep on the job at all times a modern and sanitary container for drinking water. Individual cups shall be furnished and cold water shall be furnished in hot weather at all times.

(31)    Any employee leaving the job site before quitting time without first notifying the Foreman, shall be sufficient reason for discharge.

## ARTICLE IV

### WORKING RULES

(32)    All units exceeding forty (40) pounds per unit, shall require two (2) men to lay them. All twelve (12) inch block units regardless of weight, shall require two (2) men to lay them.

(33)    No Steward or Foreman shall act as the exclusive sawman unless he is the only man on the job site.

(34)    The Contractor agrees to furnish mason line and all mechanical devices for cutting "Key-wall" and "Dura-wall" reinforcing. All tools and wearing apparel for cleaning and caulking shall be furnished by the Contractor or Subcontractor.

(35)    When Bricklayers are employed laying firebrick, artificial stone, or architectural terra-cotta, the Contractor shall furnish all chisels over twelve (12) inches in length and all saws when they are required; he shall pay for all sharpening of the mechanics tools when required. The Contractor shall furnish all mechanical devices necessary for the performance of the work classified as brick masonry and artificial masonry.

(36)    It is agreed that members of the I.U. of B. & A. C., will not be required to pick up any "brass" numbers or be required to punch a timeclock except as required by an Owner. If "brass" numbers, etc. are required to be picked up, it shall be done after starting time and prior to quitting time.

(37)    Any man or men laid off after fifteen (15) working days due to lack of work, reduction in forces or any legimitate reason, shall be called back first, if available. This is to apply for thirty (30) days after lay-off only. However, any member not having fifteen (15) working days shall be transferred or laid off before a member having fifteen (15) working days unless the Contractor has the consent of the Union or its Representative. This section applies only on a job basis and is in no way to be considered on a Company-wide basis. When an employee is laid off or discharged, the Contractor shall furnish the man with a "lay-off" slip, stating the reasons for such lay-off or discharge and shall include the correct name and address of the employer and dates of the man's employment.

(38)    In cases where the members are compelled to lose time during the regular working day, for the erection and/or the stocking of materials on scaffolds or the breakdown of equipment, they shall be paid for 4 hours if such stoppage occurs before the lunch hour and if such stoppage occurs after the lunch period, they shall be paid for 8 hours.

The employees must remain on the job to be eligible for such pay, unless told he can leave by the employer.

If such breakdown or stoppage carries over to the following day, the men shall be notified whether or not they shall report for work the next day.

(39)    No employee shall raise the line more than one (1) course at a time except to obstructions.

— 4 —

(40)    The Contractor agrees that on all cutting machines, he will furnish safety or diamond blades, and will furnish all equipment for cutting (wet or dry) such as respirators, safety goggles, rubber aprons and gloves. A stove or other means of heat, shall be furnished for the "saw man" in cold weather.

(41)    The contractor shall be liable or responsible for the loss of all tools and clothing due to fire or theft by forcible entry while employees are off the job. Such loss of tools and clothing not to exceed Two Hundred ($200.00) Dollars it being understood that employees shall submit a notarized statement substantiating the loss. In case of accident by a scaffold breaking, the Contractor shall be responsible for damage to tools for a sum not to exceed One Hundred ($100.00) Dollars.

## ARTICLE V

HOURS OF WORK, PAY DAY
REPORTING AND OVERTIME PROVISIONS

(42)    Eight (8) hours pay will be received for eight (8) hours of work. The eight hours will be worked between 7:00 A.M. and 4:30 P.M. with a 30-minute lunch break. Clean up time of 10 minutes will be given and the employees will remain on the job till quitting time.

(43)    If job conditions or the cooperation with other trades warrents same, time worked before 7:00 A.M., during the noon hour and after 4:30 P.M. will be at one and one-half (1½) times the regular rate of pay, except refractory work, which will be at double time rate. Five days, Monday through Friday, shall constitute a regular work week.

When and if the normal construction industry trades enact within their contract to allow 4 10-hour days to comprise a 40-hour week, then both parties agree to work out suitable language for this agreement.

If Daylight Savings Time is reinstated in the winter months, the quitting time may be changed to 5:30 P.M.

(44)    One and one-half (1½) times the employee's regular rate of pay shall be paid for all work in excess of eight (8) hours per day or forty (40) hours per week, whichever is greater, but not both.

(45)    Double the regular rate of pay shall be paid for all work on Sundays and the following Holidays: New Years Day, Decoration Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. If any of the Holidays fall on Sunday, they shall be observed on the Monday following.

(46)    No overtime work shall be done without the express permission of the Business Representative. No work shall be performed on Labor Day except in cases of extreme emergency.

(47)    SHIFT WORK: Where two shifts are employed, the first shift shall work eight (8) hours, the second shift shall work seven (7) hours and thirty (30) minutes for eight hours pay. Where three shifts are employed, the third shift shall work seven (7) hours for eight hours pay.

The second and third shifts shall on Friday night work at straight time rates in order to complete a full five-day week.

When two (2) ten (10) hour shifts are worked, the first shift will work nine and one-half (9½) hours with ten hours pay, the second shift will work nine (9) hours with ten hours pay. When two twelve (12) hour shifts are worked, the first shift will work eleven and one-half (11½) hours with twelve hours pay, the second shift will work eleven (11) hours with twelve hours pay.

Under no circumstances shall an employee work more than one shift in any twenty-four (24) hour period.

(48)    On a one shift operation if any work must be done exclusively after regular working hours said work shall receive eight (8) hours pay at regular scale for seven (7) hours and thirty (30)

minutes work. All work in excess of seven (7) hours and thirty (30) minutes shall be at the overtime rate.

(49)    All men working in this jurisdiction shall be paid in currency or check, on the job, at least one-half hour (½) before quitting time on pay day, pay at two times the regular rate of pay will be paid for time waiting for checks after quitting time. Five (5) days will be held back if Contractor so desires.

If the employees are not working on the regular pay day, they shall be paid, on the job, before 9:00 A.M. The employees shall be paid the regular rate of pay for any time waited thereafter.

Any Contractor who fails to have sufficient funds in the bank to meet all pay checks issued to members of the I.U. of B & A.C. shall forfeit his right to pay by check. The contractor shall furnish to each employee a record of the amount paid in the period in which the wages were earned, the number of hours worked and all payroll deductions fully itemized.

When an employee is laid off, he shall be given one-half (½) hour's notice of same to collect tools and clothing and leave the job site, and shall be paid in full on the job unless otherwise agreed upon between the Union and the Contractor.

(50)    Employees are to be paid the wages applicable to the work performed without any discount and in return, the Contractor shall receive a fair and honest day's work without any slowing down or stoppage of work.

(51)    Any injured employee shall be paid in full for any time lost on the day of injury, if in a doctor's opinion he cannot return to work because of an undisputed occupational injury suffered on the job that day.

(52)    Employees receiving a bad check (non-negotiable) shall receive an additional eight (8) hours wages and, if not paid within twenty-four (24) hours, the members of the I.U. OF B & A.C. shall be removed from the job and shall not return until satisfactorily financial arrangements have been made.

(53)    Any employee who reports to the job site at starting time and inclement weather makes if impractical to work, or work is not provided, shall be paid one (1) hour show-up time. When the employee works beyond the first one (1) hour, he shall receive four (4) hours pay. If an employee continues work after lunch period, he shall receive six (6) hours pay. If an employee continues work after six (6) hours he shall receive eight (8) hours pay. The employee must remain on the job premises for the above mentioned hours unless dismissed by the Employer.

(53a)    SATURDAY MAKE-UP DAY. Saturday will be worked at straight time plus $1.00 premium per hour if a Monday, Tuesday, Wednesday or a Thursday is lost during the work week due to inclement weather conditions. This shall apply only to the months of November through April. Working a Saturday make-up day will be at the option of the employee and the employer. The employer must notify the employees by quitting time Thursday that Saturday will be a make up day. Saturday will be considered a normal work day with respect to all work rules. Only the job crew that missed the inclement weather day on their job will be on the make-up day crew. The employer shall not discriminate against any employee, in any manner because the employee refuses to work a Saturday make-up day. Eight (8) hours guaranteed pay will apply for a Saturday make-up day. If any other craft on the Saturday make-up day jobsite receives overtime such as, time and one half or double time, the masons will receive the same. The employer shall notify Local 46 office before any Saturday make-up day is worked.

Paragraph 53a Saturday Make-Up Day does not include the Cement Masons or Refractory Masons.

(53b)    An alcohol and drug policy has been agreed upon in these negotiations. The wording is to be added to this agreement as an addendum when final wording is agreed upon.

(54)    Appendix A. is attached hereto and made a part of this Agreement.

## ARTICLE VI

### GENERAL WORKING CODE AND CONDITIONS

(55)    Mortar boards and material shall be securely raised up a minimum of sixteen (16) inches, but not more than thirty-six (36) inches.

(56)    Material should not be stock piled higher than forty-eight (48) inches above the working scaffold or standing level where the employee is working.

(57)    There shall be ladders provided for all scaffold.

(58)    At no time shall a wall or lead be built over four (4) feet, eight (8) inches in height for scaffold high, unless in extreme necessity. No scaffold shall be built in such a manner that the standing level is above the wall.

(59)    On walls or leads of four (4") six (6") or eight (8") inch clay partitions they may be built five (5) feet two (2) or five (5) feet three (3) inches for scaffold high.

(60)    Whenever, in the construction of any wall, there is a possibility of danger to the employee, no working level shall be situated so as to require the employee to reach down more than twelve (12) inches in the performance of his work.

(61)    Masonry walls shall not be less than eighteen (18) inches above a cable or suspended scaffold.

(62)    All walls over fourteen and one-half (14½) inches in thickness shall be manned by two men, one or each side of the wall when both faces of the wall are finished.

(63)    Where dusty conditions prevail, respirators shall be furnished and worn. Safety goggles shall be provided and worn when engaged in work requiring them. During hot weather or on "hot" jobs, the Contractor shall provide suitable fatigue aids.

(64)    It is further agreed that when the safety and general health of the employee is endangered the Contractor shall correct such situations.

(65)    It shall be the duty of the employees to comply with all job safety and sanitary conditions provided by the Contractor. Repeated failure to comply with such regulations or conditions shall be reason for termination without recourse. All safety equipment furnished by the employer shall remain the property of the employer and shall be returned to him. All hard hats shall have new liners before reissuing.

(66)    When a mason is working in a ditch he shall have a minimum of sixteen (16") inches from the face of the wall to the side of the ditch in which to work.

(67)    The two inside planks of all scaffolds shall be kept clear of all materials. Foot scaffolds shall not exceed eighteen (18") inches in height, measured from the level on which the supports are placed. Mason's foot scaffolds imposed upon other scaffolds shall be limited to twelve (12") inches in height when supported on brick, tile or block. When in excess of twelve (12") inches but not over eighteen (18") inches in height, the supports shall be small horses not more than one tier high.

(68)    When scaffolding stacks or chimneys, if the cable type is used, the cable shall be of proven strength and planking shall be of number one grade material and clear of knots. All provisions of OSHA rule 1926.45 for scaffolding shall be compiled with.

(69)    No ladder shall extend more than thirty (30) feet without a break or platform. See OSHA Standards.

(70)    PREMIUM PAY: Any job or project that pays a premium, overtime or a bonus to recruit men, such bonus, premium or overtime shall continue to be paid until said job or project is completed. However, the Union may, at its discretion, waive such pay if the situation warrants.

(71)    When out-of-town Contractors bring members of the I.U. of B & A.C. into the jurisdiction stated herein and pay them a higher rate of wages than is called for by this Agreement, all members of the I.U. of B & A.C. on that particular job or jobs shall receive such wages. Subsistence and transportation pay are not to be considered as wages.

(72)    The ramming and spading of plastics and gunniting shall also be paid at the rate of one dollar ($1.00) above the regular rate. When a man starts on acid or carbon brick he shall be paid the premium pay for the full day, regardless of the number of hours actually worked on these materials.

(73)    All free standing stack work shall be fifty-cents (50¢) per hour above regular scale of wages and ground level to top of the stack. This will include all brick and masonry cement on industrial and institutional free standing stacks; also concrete work and exterior masonry from a swinging stage or bosun's chair. Radial brick, common brick, face brick, and acid brick linings. All sandblasting and the laying of carbon masonry material in all swinging stage and/or scaffold will be at the rate of fifty cents (50¢) per hour above the regular scale of wages plus bonus chair. When working on vertical slip forms. Jump forms or continuous forming of any kind, the Cement Mason shall be paid fifty (50¢) per hour above the base rate for all work from the base up to fifty (50) feet. Above that height, he shall be paid at the rate of time and one-half (1½) the regular rate.

(74)    Any time members of the I.U. of B. & A.C. are required to work on "hot" work, they shall receive One Dollar ($1.00) per hour above the scale.

(74a)    Paragraph 53a does not include refractory masons.

## ARTICLE VII

### FIREBRICK WORKING CODE

(75)    Backfill on all firebrick work shall be done by bricklayers only and at such time as the specified height is reached and after walls are completely level in courses.

(76)    All walls over sixteen (16) inches thick shall be saddled by two bricklayers. The line shall be raised on both sides simultaneously.

(77)    When electrical grinding stones or carborundums are being used, the men that are not so engaged shall leave that part of the job until the grinding operation is finished. No one bricklayer shall be kept grinding continuously and adequate rest periods shall be given to the men engaged in this operation.

(78)    Scaffold height on oven walls shall not exceed four (4) feet in height. This does not apply to generator walls.

(79)    It shall be the duty of any member to assist a fellow bricklayer who may be causing delay.

(80)    Four (4) feet shall be scaffold high in ovens, stoves and stacks. A solid scaffold must be installed every six (6) feet in blast furnaces. Platform boards shall be two (2) inches thick. A bench scaffold four (4) feet in width must be installed at the height of three (3) feet in blast furnaces. The last course of scaffold height shall be the tram course.

(81)    All ladders shall be staggered and not straight up and down. Adequate lighting is to be provided to insure safety when ascending or descending ladders. A stopping off place shall be provided every twenty (20) feet with a back rest. An emergency ladder shall be suspended from the top in all blast furnaces.

(82)    When Bricklayers are engaged in laying brick where dusty conditions, the Contractor shall provide approved respirators.

He shall also provide safety goggles when conditions warrant the same; he shall provide the necessary precautionary devices on jobs where gas may exist so that the men may be warned in due time. When bricklayers are employed on excessively hot work, the Contractor shall provide proper counter-fatigue aids which shall meet the standards of the State Medical Board. proper gloves and protective materials to safeguard bricklayers when handling hot work. He shall supply wooden shoes or similar devices when the employees are working on heated surfaces, and the Contractor shall be responsible for all tools, clothing and shoes of the bricklayer that may have been burned in the performance of their work. This shall also apply to other jobs where clothes, tools and/or shoes are destroyed due to exceptional conditions.

(83) When bricklayers are working on blast furnaces, stoves, dust catchers, stacks, or other firebrick jobs where scaffolds are used, the Contractor shall have fire extinguishers on the scaffold at all times.

(84) When working in blast furnaces and high temperature cement is used the Contractor shall furnish safety glasses.

(85) No racking back shall be permitted in a blast furnace.

(86) Bricklayers shall not be required to start more than one course of bottom block at a time. Each course shall be finished and ground before another course is started.

(87) All caulking and cutting of asbestos rope shall be the work of the bricklayer.

(88) A ten minute period shall be allowed at the end of a shift when employed on firebrick work. Adequate time shall also be allotted for walking time to and from the plant's parking lot.

(89) On all blast furnace work, scaffolding shall be a minimum of four (4) feet high and a maximum of four(4) feet six (6) inches high. All scaffolding shall be of the solid type, excepting the large cable type used in the blast furnace. No scaffold shall be raised higher then eighteen (18) inches below the top of a solid wall.

(90) All connections in blast furnaces, stoves, etc. which are using a poured substitute shall be puddled by members of the I.U. of B & A.C. this shall include all plastic brick or substitutes therefore.

(91) No clays shall be mixed in the enclosure where refractory brick are being laid, a separate shed shall be provided for the mortar man, all refractory brickwork shall have a sweeper on the job to keep floors, walks, runaways and scaffolds free of dirt, dust and he shall keep same properly wet down at all times.

(92) When bricklayers are working on carbon material, they shall have twenty (20) minutes clean up time before lunch and before quitting time. The Contractor shall furnish kerosene or diesel oil for soaking tools in each night at quitting time. He shall also furnish cleaning cloths and detergents for bricklayers use when working on carbon material.

(93) Tools shall be dressed at the expense of the Contractor, or the Contractor shall furnish and install carboloy tips as required.

## ARTICLE VIII

### APPRENTICES

(94) In order to maintain a sufficient number of skilled mechanics in the building and construction industry, the necessity for the employment of apprentices is hereby recognized and the employment and proper training of as many apprentices as is reasonable and practicable shall be encouraged and undertaken by the Contractor and the Union. The Apprenticeship Program shall be administered by the Joint Bricklayers Apprenticeship Committee composed of equal representation from the Contractors and the Union. The Contractor and the

Union hereby agree to be bound by the terms of an Agreement and Declaration of Trust establishing an "Apprenticeship Education and Trust Fund." The Bricklayers Joint Apprenticeship Committee shall from time to time determine and set the amount of contribution to said Trust Fund. A certified copy of the annual audit of such Fund shall be made available to all participating Contractors.

(95) It is agreed that, in order to better our trade and to train sufficient skilled mechanics a four (4) year apprenticeship shall be served. Wherever possible the Local Union shall compel all apprentice bricklayers to attend an apprentice school for a period of four (4) years, said school to have a local Journeymen Instructor. It is further agreed that to defray all cost of operating such apprenticeship school, all Contractors performing work in this jurisdiction shall pay six cents (6¢) per hour for all hours worked in order to maintain and support said school.

(96) It is mutually agreed that a Contractor shall not bring any apprentice other than one who is indentured to him into this Local's jurisdiction unless specifically agreed to by the Local Union.

(97) At the discretion of the Joint Apprenticeship Committee Contractors, who in the previous calendar year employed bricklayers for a total of 6,000 man hours or more, shall indenture an Apprentice. It is also agreed that if (4) four journeymen bricklayers are employed on the job and more bricklayers are needed, the fifth (5th) member of the I.U. of B & A.C. will be duly registered apprentice of this Union, if available.

(98) Apprentice pay shall be:

| | |
|---|---|
| 1st 6 mos. - 45% | 5th 6 mos. - 72% |
| 2nd 6 mos. - 50% | 6th 6 mos. - 80% |
| 3rd 6 mos. - 55% | 7th 6 mos. - 87% |
| 4th 6 mos. - 65% | 8th 6 mos. - 95% |

(99) The Apprentice may operate the masonry saw and other cutting tools under the supervision of a bricklayer Steward or Foreman, for training purposes only. The Apprenticeship shall not drive trucks or perform other work than that which is directly associated with the masonry trade.

(100) The control of all Apprentices working in the jurisdiction of the several Unions signatory to this Agreement shall lie in the hands of several Joint Apprenticeship Committees, and all Apprentices shall be subject to the decisions of said committees.

(101) The Joint Apprenticeship Committee shall consist of equal representatives from the Union and from the Contractor Alternates shall be appointed from each group. The Trustees of the Apprenticeship, Education and Training Trust Fund shall also attend the meetings of the Local J.A.C.

(102) The Contractor and the Union agree to abide by the Standards of the Joint Apprenticeship Committee. The Apprentice shall not be laid off from the job so long as two journeymen bricklayers are employed on said job. The last three members on a job shall be a journeymen or foreman, the Steward and a Local Apprentice. The Contractor shall notify the JAC or the Local Union when an Apprentice is laid off.

## ARTICLE IX

### FRINGE BENEFIT FUNDS

(103) The fringe wage benefit programs contained herein shall apply to all Contractor members of the Labor Relations Division of the Ohio Contractors Association, The Associated General Contractors of America, Inc., any or all Contractors who may become signatory or bound by this Agreement, and any other Contractor or Group of Contractors who become a party to an Agreement Covering the Local fringe wage benefit programs set forth herein.

All contractors bound hereby do agree to be bound by the Agreements and Declaratins of Trust, as amended, establishing

Pension Plans, Welfare Plans, and Apprenticeship Funds, copies of which all parties agree have been furnished to and read by all Contractors bound hereby prior to the execution of this Agreement. It is mutually agreed that the provisions of said Agreements and Declaration of Trust and any Rules, Regulations or Plans adopted by the Trustees pursuant thereto shall become a part of this Agreement as though fully written herein. All Contractors bound hereby irrevocably designate the Contractor Trustees of said Funds and their successors, as their representative for the purposes set forth in said Agreements and Declarations of Trust.

Fringe Wage Benefit contributions shall be paid at the following rates for all hours paid to each employee by the Contractor under this Agreement at straight time hours worked, and at one and one half (1½) the hourly rate for overtime hours worked at time and one-half, and, hours worked shall include reporting hours paid.

The fringe wage benefit contributions shall be paid as outlined in Appendix A. The payments to the Fringe and/or Benefit Funds covered under the terms of this Agreement shall be made by each Contractor/Employer on or before the fifteenth (15th) day of each month covering the required payments for the preceding month. Contributions not received by or postmarked later than the twentieth (20th) day of the month, to allow for weekends and legal banking holidays shall be assessed ten (10%) liquidated damages on the unpaid balance.

The liquidated damage assessment shall accrue interest from the date that it is found to be due and owing, until paid.

**Bricklayers Pension Fund** — as stated in Appendix A of Agreement.

**Bricklayers Health and Welfare Fund** — as stated in Appendix A of Agreement.

**The Bricklayers and Trowel Trades International Pension Fund** — as stated in Appendix A of Agreement.

Bricklayers per Capita for Local 46 - Each employer shall withhold from each Employee 2% dues check-off for each straight time and overtime hour worked. This 2% dues check-off will be shown on the Combined Form provided by the Union to the Employer.

It is further understood and agreed to between the parties that duly authorized representatives of any of the said Trust Funds shall have the right, on written notice, to audit the books and records of any party obligated under this Agreement to contribute thereto, with respect to the hours worked by and wages paid to all Employees upon whom the Contractor is obligated to make contributions.

For Contractors/Employers not previously party to an agreement with Ohio Bricklayers, or in the event that any Contractor/Employer becomes delinquent in the payment of any fringe benefit contributions, the Union may, in its sole discretion, require the Contractor/Employer to post an appropriate wage and/or fringe benefit performance bond, report and pay fringe benefit contributions on a weekly basis, pre-pay fringe benefit contributions, or comply with any other reasonable request by the Union to assure prompt, accurate, and secured payments for fringe benefit contributions due and owing by the Contractor/Employer.

Any delinquency shall be deemed a breach of the agreement and the Union may resort to any remedies available for breach or default of the agreement, including, but not limited to the right to withhold its services from any

delinquent Contractor/Employer until payment is made and any delinquency resolved.

In addition to the assessment of liquidated damages, in the event that any action or proceedings against any participating Employer is necessary to enforce the payment of any contributions to the Fringe Benefit Funds in the timely manner, as outlined above, the Trustees or the Union shall have the right to sue and recover on behalf of the Funds, the amount of the unpaid contributions, if any, plus the assessed liquidated damages, plus interest as appropriate, and any and all court costs and reasonable attorney's fees.

Each Contractor who employs members of the I. U. of B. & A. C. within the jurisdiction covered by this Agreement shall post a cash bond in the amount of $750.00 for all jobs that involve less than 250 hours of bricklaying work and a $5,000.00 bond for all jobs representing more than 250 hours work. In each succeeding year the number of hours worked by the bricklayers for each Contractor shall be reviewed, and the amount of the bond may be revised in accordance with the number of hours worked by said members of the I.C. of B. & A.C. Said Bond shall guarantee the payment of all labor performed under this Contract including the payment of monies due the Health & Welfare, Pension and Funds of the various Unions. The cost of any legal action necessary to secure payment to the above funds shall be paid by the bonding agency or Contractor. Contractor members of the Ohio Contractors Association shall not be required to post bond unless there has been a history of delinquency by said contractor.

**ARTICLE X**

JURISDICTIONAL DISPUTES,
GRIEVANCE PROCEDURE
AND ARBITRATION

(104)  **Jurisdictional Disputes:** No jurisdictional picket lines or strikes shall be recognized.

The Contractor shall make the assignment of work based on area practice of the industry.

If the Union contends that the work has been wrongly assigned, the Union shall notify the Contractor of its jurisdictional claim.

If the dispute cannot be resolved on the job between the Contractor and the contesting Unions, a meeting shall be held between the International Unions involved, the Labor Relations Division of the Ohio Contractors Association and the Contractor and an attempt will be made to resolve the dispute. If the dispute is not resolved at that meeting, the dispute shall be referred to the National Joint Board for Settlement of Jurisdictional Disputes for settlement and said settlement shall be binding on all parties.

A purpose of this Agreement is to promote a harmonious relationship between the Contractor and the Union and to settle any disputes occuring during life of this agreement in a peaceful manner as outlined herein.

(105)  **Grievance Procedure:** There shall be no stoppage of work because of any difference of opinion or dispute which arises between the Union and the Contractor.

In the event any differences of opinion or any grievances concerning interpretation of the Agreement arise during the term of this Agreement, an earnest effort shall be made to settle the differences or grievances in the following manner it being specifically agreed that an employee failing to report a grievance to the Business Agent within two (2) weeks, the grievance shall be deemed waived and abandoned:

— 8 —

Step 1 — The Local Union Business Representative shall meet with the Contractor Representative and attempt to settle the matter. If no settlement can be reached then

Step 2 — The difference or grievance shall be referred to a committee consisting of two (2) members, one to be named by the Labor Relations Division of the Ohio Contractors Association, The Associated General Contractors of America, Inc., and one to be named by the I.U. of B. & A.C. local union involved.

Step 3 — The difference of opinion or grievance may be referred to the State Joint Committee consisting of six (6) members three (3) to be appointed by the Labor Relations Division of the Ohio Contractors Association, The Associated General Contractors of America, Inc., and three (3) to be appointed by the I.U. of B. & A.C. If the Local Arbitration Committee is unable to resolve the dispute within three working days, a letter shall be sent to the American Arbitration Association requesting binding arbitration. If no letter is sent at that time, then a work stoppage resulting from the dispute shall not be in violation of the Agreement.

Step 4 — The grievance shall then be referred to an Arbitrator selected by the Committee referred to in Step 3. If no agreement is reached by the State Joint Committee on the naming of an Arbitrator, then the rules of The American Arbitration Association for selecting an Arbitrator shall apply. Decision of the Arbitrator shall be final and binding on all parties and expenses of the Arbitrator shall be borne equally by each party to this Agreement.

(106)    The Contractor agrees that its employees will not be required under penalty of discharge or discipline of any kind to walk through or cross in any manner any legally constituted picket line maintained by any labor organization, and any refusal to cross a legally constituted picket line, singly or in concert, shall not constitute a breach of this Agreement. No jurisdictional picket line will be recognized.

## ARTICLE XI

CEMENT MASONS WORK
COVERED AND WORKING
CONDITIONS

(107)    All concrete construction, including foremanship of same, such as buildings, bridges, silos, elevators, smoke stacks, curbs and gutters, sidewalks, streets and roads, paving, alleys and roofs of poured concrete and all flat surfaces of cement, rock asphalt, the laying and spreading and finishing of all types of bituminous concrete including all types of vacuum mats used in the drying of cement floors in preparing same for finish, the operation of power driven floats and trowelling machines, shall be that of the cement mason. Mastic flooring, whether laid free handed or in precast form on the job; otherwise known as asphalt or mastic tile, and all other types of resilient floor covering, the finishing and washing of all concrete construction, using any color pigment when mixed with cement in any other form, mosiac and nail coat when done by brush, broom trowel, float, or any other process including operation of machine for scoring floors, or any other purpose they may be used for in connection with the cement masons' trade. The rodding, spreading and finishing of all top materials, sills, coping, steps, stairs and risers and running all cement, and plastic material six (6) inch base or less, shall be the work of the cement mason. All preparatory work on concrete construction to be finished, or rubbed, such as cutting of nails, wires, wall ties,

etc., patching, brushing, chipping and bush-hammering, rubbing or ginding if done by machine or carborundum stone of all concrete construction, resetting of all strips, screeds, stakes and grades and curb forms. All glass set in cement. The pointing, patching and caulking around all steel or metal window frames that touch concrete. All dry packing, grouting and finishing in connection with setting all machinery such as engines, pumps, generators, air compressors, tanks, etc., that are set on concrete foundations. All prefabricated and pre-stressed concrete construction on the job site and in the shop, including the supervision of the same, such as sidewalks, steps, floor slabs, beams, joists, walls, and columns, also, the screeding, finishing, rubbing, grouting, pointing and patching of same. This shall not constitute a waiver of the Bricklayers to set, plumb, level, align, caulk, grout, paint, dry-pack pre-cast concrete units and the bolting or welding of same. All form work that is not more than 12" high and is not composed of any more than one piece of material high shall be set by cement finishers.

(108)    When pouring concrete slabs or concrete, the surface of which is to be struck off or finished to a given line, all cement masons necessary to finish  same shall start at work coming within the jurisdiction of the cement mason, when pouring begins, This applies also to pouring of topping on old slabs or any other surfaces.

(109)    The curing, hardeners and sealers used on finished concrete, whenever necessary, whether by chemical compounds or otherwise, shall be the work of the cement mason.

(110)    The spreading of darbying, trowelling, screeding of all types

of magnesium oxychloride cement composition floors shall be the work of the magnesite composition cement mason; including all types of oxychloride granolithic or terrazzo composition floors, hand grinding, or machine grinding; the preparation of sub-floor surfaces, bonding, the preparation and installation of ground or base courses, steps and cove base. The purpose and intent of the six (6") inch base law will not be defeated.

(111)    All magnesite composition work shall be done under the supervision of a competent and qualified composition cement mason.

(112)    All composition, mastic, rock asphalt and magnesite work are the work of the cement mason.

(113)    Gunnite work handling of the cement gun. When the works is less than one and one-half (1½") inch in thickness, the handling and control of the nozzle shall be the work of the cement mason.

(114)    Recognizing that the funds available for construction work shall accomplish the greatest possible benefits for the Public, the Contractor and the Union agree that all machinery that increases man hour production of cement masons shall be used without restrictions.

(115)    There shall be no restriction on the use of the Finishing or Floating Machines. Under no circumstances shall work be left under machine finish unless so specified in the specifications by owners or architect.

(116)    If any work must be done exclusively after regular working hours, said work shall be done at eight (8) hours pay for seven (7) hours work. All work in excess of seven (7) hours shall be at the rate of (2) two times the regular rate.

(117)    Foreman: On all jobs requiring two (2) or more Cement Masons, there shall be a Foreman. The Foreman may work with his tools regardless of the number of employees he is directing. Whenever the Cement Mason is asked to take charge of the Laborers, layout the work and handle the details of the

—9—

work, it is agreed that he shall receive Foreman's wages even though one (1) Cement Mason on the work. The Foreman shall receive orders from the Superintendent only. The Cement Mason and Superintendent in charge of the job shall determine the number of Cement Masons necessary to handle the job. If they disagree the Contractor shall be responsible for any inferior work if it develops the cause was from working shorthanded.

Foreman Rate: To be 10% above journeyman scale.

General Foreman: When an employer is working under any International Maintenance Agreement, the term General Foreman referred to in the Maintenance Agreement shall mean 20% of journeyman's rate as a premium.

(118)    Stewards: The first journeyman on the job shall be the Steward, pending selection of a Steward by the Business Agent. The Steward shall check all Union books to insure that the provisions of Article II are complied with. The Steward shall take up all grievances on the job and try to have same adjusted; in the event he cannot adjust them, he must promptly report the fact to the Business Agent. The Steward shall not be discriminated against for performing his duties as Steward. It shall be the Steward's duty to see that overtime is shared on the job. No Steward will be discharged until a hearing is held between the Business Representative of the Union and the Contractors Representative to hear evidence of the circumstances surrounding the discharge.

(119)    Working Conditions: Any cement Mason forced to work in the rain shall be amply protected with raincoat furnished by the Contractor.

(120)    Cement Masons shall not be required to work in a room with open coke salamanders.

(121)    Where cement masons are waterproofing or finishing floors in elevator pits or sumps, the same shall be planked over solid one story above.

(122)    When finishing concrete, the work shall be completely finished, there will be no finishing of the previous day's work on the following day with the exception of inclement weather.

(123)    At such times as the Contractor required overtime work, as permitted by this Agreement, it is agreed that there shall be a thirty (30) minute paid lunch period at the end of the first two (2) hours overtime. In the event additional overtime is required exceeding an additional four (4) hours, the Contractor agrees to pay the men for a second thirty (30) minute lunch period.

(124)    The use of Concrete Saws for cutting construction joints on new work, and the filling of such joints with material such as latex epoxys, lead, mastic, tar and similar materials shall be done by Cement Masons.

(125)    The Contractor shall furnish straight edges (5,4) stock darbies, knee boards, carborundum stones and brushes. Straight edges pulled by one man shall not exceed twelve (12") in length.

(126)    All exposed industrial and commercial floors that are required to be hard trowled shall be trowled by hand at least once behind the finishing machine.

(127)    The Cement Finishers shall put in expansion strips (wet screeds): do all waterproofing, lead wool, synthetic solutions, membranes, etc. he shall do curing of all kinds, (water, burlap, and all emulsions spray cures).

(128)    Lunch time shall be between the fourth and fifth hour or the Cement Finisher shall receive one (1) hour's pay for the missed lunch time and he shall be permitted to take time for lunch before his sixth hour as long as work does not stop or hinder the progress of work.

(129)    Premium Pay: When working on vertical slip forms, jump forms or continuous forming of any kind, the Cement Mason shall be paid fifty (50¢) cents per hour above the base rate for all work from the base up to fifty (50) feet. Above that height,

he shall be paid at the rate of time and one-half (1½) the regular rate.

All free standing stack work shall be fifty cents (50¢) per hour above regular scale of wages from ground level to top of the stack. This will include all brick and masonry cement on industrial and institutional free standing stacks; also concrete work and exterior masonry from a swinging stage or Bosun's chair. Radial brick, common brick, face brick, and acid brick linings. All sandblasting and the laying of carbon masonry material in all swinging stage and/or scaffold will be at the rate of fifty cents (50¢) per hour above the regular scale of wages plus bosun chair.

(130)    Cement Masons working on colored or shake floors and epoxy floors shall receive fifty (50¢) cents per hour above the regular scale.

(130A)    Premium for topping materials (emery, iron, etc.)will be fifty (50¢) cents per hour above the regular scale.

(130B)    Paragraph 53a does not include cement mason work.

## ARTICLE XII

### CONSTRUCTION ADVANCEMENT PROGRAM OF NORTH CENTRAL AND EAST CENTRAL OHIO

(131)    The Contractor and the Union agree to and approve the establishment of a program to promote the common good of the Construction Industry in the North Central and East Central Ohio Area by providing financial support for activities which may include, but not necessarily be restricted to, the study and service of:
(a) Public Relations.
(b) Public Education as pertaining to the Construction Industry.
(c) Market Development.
(d) Protection of legitimate markets.
(e) Personnel Practices and Labor Relations, including:


1. Promotion of Safety.
2. Standardization of contracts and practices.
3. Promotion of stability in personnel practices and labor relations.
4. Adjustment and arbitration of grievances.
5. Settlement of jurisdictional problems.
6. Apprenticeship training programs.
7. Health and Welfare Funds for employees.
8. Pension Funds for employees.
9. Vacation Funds for employees.

(f) Collection and distribution of information from and to all segments of the Construction Industry and related groups of authorities.


The Contractor and the Union agree to and approve the establishment of the Construction Advancement Program of East Central Ohio area by a Declaration of Trust dated May 10, 1964, as amended to become the Construction Advancement Program of North Central and East Central Ohio, a copy of which is available for the parties at the office of the Trustees and which is included herein by reference and made a part hereof. Each Contractor covered by this Agreement shall pay 14 cents for each hour worked by each employee within the bargaining unit.

The consideration for this Agreement is as follows:

(a) Recognition by the parties of the need for providing the means whereby the Contractor can facilitate and supplement

the financing of its activities;

(b) Obligations assumed by the Contractor to withhold, collect and forward monies from the pay of its employees for the benefit of his employees in welfare funds, pension funds, and union dues check-off;

(c) Obligations assumed by the Contractor to pay, collect and forward monies for the Apprenticeship training funds.

Payments to the program shall be in accordance with instructions on forms furnished by the Trustees.

The Program is to be administered for the purpose set forth in this Article and in accordance with the terms of said Declaration of Trust.

The monthly contribution period and report shall end with and include the last full weekly pay period of the month.

Payments and reports in duplicate for each monthly contribution period shall be mailed or delivered to the program office on or before the 15th day of the following month. Payments postmarked or delivered by messenger after the 20th day of the following month shall be subject to an additional charge of 10% per month until paid, to reimburse the Construction Advancement Program for damages due to additional administrative expense, impairment of reserves, and costs of collection arising from late payment.

There is specifically excluded from the purposes of the Construction Advancement Program of North Central and East Central Ohio, the right to use any of its funds for lobbying in support of anti-labor legislation and/or to subsidize contractors during a period or periods of work stoppage or strikes.

Upon decision of the Board of Trustees and after thirty days written notice, the Contractor contribution may be raised.

## ARTICLE XIII

### SAVINGS AND SEPARABILITY

(132)    It is mutually agreed that if any clause, term or provision of this Agreement is or is hereafter found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling or ruling of any other Board or Agency having jurisdiction in the matter, such clause, term or provision shall be or become inoperative and of no effect, without disturbing the other clauses, terms and provisions of this Agreement, and the remaining parts of this Agreement shall remain in full force and effect.

(132a)    The parties recognize the problems that drugs and alcohol abuse have created in the construction industry and agree to continue negotiations on implementing drug and alcohol abuse prevention programs that will work toward maintaining a safe workplace, free of drugs & alcohol.

(133)    In the event any clause, term or provision of this Agreement is found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling, or ruling of any other Board or Agency having jurisdiction in this matter, said clause, term or provision shall be renegotiated to the mutual satisfaction of the parties; but, during such renegotiation, there shall be no interruptions of work by lockouts, strikes or other labor troubles.

## ARTICLE XIV

### CONFLICTING AGREEMENTS

(134)    If the Local 46 I.U. of B. & A.C. enters into any agreement with any individual employer or group of employers within the area of jurisdiction of this Agreement containing any more favorable wages, hours, fringe benefits, conditions, or other cost items than those contained herein, the Union agrees that any such more favorable total cost shall be automatically extended to the Employer signatories through a reduction in the base wage rate.

## ARTICLE XV

### DURATION OF AGREEMENT

(135)    This Agreement shall be effective as of June 1, 1992 and shall remain in full force and effect until Midnight May 31, 1995, and shall continue to remain in full force thereafter from year to year, provided that this Agreement will terminate at the expiration of the initial or any subsequent annual period if either party gives written notice to the other party of its desire for termination, at least sixty (60) days before such annual date; and provided further that if this Agreement is not so terminated and either party gives written notice to the other of its desire to change or modify this Agreement at least (60) days before such annual date, then this Agreement shall remain in full force and effect on a day-to-day basis after such annual date until a new agreement is negotiated and signed or until either party gives the other five (5) additional days written notice of termination.

IN WITNESS WHEREOF, we the undersigned duly authorized representatives of the I.U. of B. & A.C. Local Union listed herein and the Labor Relations Division of the Ohio Contractors Association, The Associated General Contractors of America, Inc., executed this Agreement on the 2nd day of May, 1989.

LOCAL UNION 46 of the International Union of Bricklayers and Allied Craftsmen

LOCAL 46

S/Dale H. Mareches
S/Brad Hess
S/Steven W. Shively
S/Robert Troxell
S/Ken Hineline


LABOR RELATIONS DIVISION, BUILDING SECTION, OF THE OHIO CONTRTACTORS ASSOCIATION, THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC.

S/Bill Heffner
Chairman, Labor Executive Committee

S/Skip Carter
Chairman, Negotiating Committee

S/Tom Hitchings
Manager, Labor Relations

S/Tom Mayle
Labor Relations


## APPENDIX A


### RATES OF PAY — EFFECTIVE DATES OF RATES AND FRINGES

Local 46 (Counties covered: Erie; Hancock; Huron; Ottawa; Sandusky; Seneca; The Islands of Lake Erie north of Sandusky; the Townships of Tymochtee, Ridge and Richland in Wyandot County; the Townships of Perry and Bloom and Wood County.)

Bricklayers, Caulkers, Pointers, Cleaners, Blocklayers, Stonemasons, Tilelayers, Terrazzo, Marble Masons, Sewer Bricklayers, Plasterers, Gunnite Masons, and Refractory Masons.

| | 6-1-92 | Effective Rates | |
| | | 6-1-93 | 6-1-94 |
|---|---|---|---|
| Base Hourly Rate | $18.23 | ⁱ .60 | |
| Health & Welfare | + 2.30 | To Be | |
| State Pension | + 1.69 | Allocated | + .60 |
| Apprenticeship | + .06 | | |
| CAP | + .14 | | |
| IMI | + .04 | | |
| International Pension | + 1.50 | | |
| 2% dues check-off per hour | | | |
| Foreman | + 10% | | |
| General Foreman | + 20% | | |

Layout Man: Rate fifty (50¢) cents per hour above jorneyman rate
Sawman: Rate twenty-five (25¢) cents per hour above journeyman rate.
For other premiums see Paragraphs 70 through 74, 129, & 130.

Tile, Terrazzo and Marble Mason's Helpers:

| | 6-1-92 | Effective Rates | |
| | | 6-1-93 | 6-1-94 |
|---|---|---|---|
| Base Hourly Rate | $14.58 | To Be | |
| Health & Welfare | + 2.30 | Allocated | |
| State Pension | + 1.69 | | |
| Apprenticeship | + .06 | | |
| CAP | + .14 | | |
| IMI | + .04 | | |
| Int'l Pension | + 1.50 | | |
| 2% Dues Check-off per hour | | | |

**Cement Finishers and Plasterers:** (Counties covered: As indicated above
EXCLUDING Hancock County)

| | 6-1-92 | Effective Rates | |
| | | 6-1-93 | 6-1-94 |
|---|---|---|---|
| Base Hourly Rate | $18.23 | ⁱ .60 | |
| Health & Welfare | + 2.30 | To Be | |
| State Pension | + 1.69 | Allocated | + .60 |
| Apprenticeship | + .06 | | |
| CAP | + .14 | | |
| IMI | + .04 | | |
| International Pension | + 1.50 | | |
| 2% dues check-off per hour | | | |
| Foreman | + 10% | | |
| General Foreman | + 20% | | |

For other premiums see Paragraph 73, 129 and 130

Fringe Payments shall be made to:  Stoner & Associates
1104 5th & Race Tower
Cincinnati, Ohio 45202

## ASSENT TO
## COLLECTIVE BARGAINING AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration the undersigned employer although not a member of the Labor Relations Division of the Ohio Contractors Association, does hereby join in adopt accept and become a party to the collective bargaining agreement heretofore made by the Labor Relations Division of the Ohio Contractors Association with Local Union 46 of the International Bricklayers and Allied Craftsmen including all of the provisions therein and any amendments made thereto, and including those provisions pertaining to contributions to Trust Funds, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required, and authorizes these parties to name the Trustees to administer said Funds and ratifies and accepts such Trustees and the terms and conditions of the Trusts as if made by the undersigned.

Name of Company

Street

City                              State                              Zip Code

Company Phone Number

Authorized Representative and Title

Date                              Ohio Workmen's Compensation No.

Name of Union

Street

City                              Street                              Zip Code

By

Witness

**Company Copy**

## ASSENT TO
## COLLECTIVE BARGAINING AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration the undersigned employer, although not a member of the Labor Relations Division of the Ohio Contractors Association, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the Labor Relations Division of the Ohio Contractors Association with Local Union 46 of the International Union of Bricklayers and Allied Craftsmen including all of the provisions therein and any amendments made thereto, and including those provisions pertaining to contributions to Trust Funds, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required, and authorizes these parties to name the Trustees to administer said Funds and ratifies and accepts such Trustees and the terms and conditions of the Trusts as if made by the undersigned.

---
Name of Company

---
Street

---
City                                State                              Zip Code

---
Company Phone Number

---
Authorized Representative and Title

---
Date                                           Ohio Workmen's Compensation No.

---
Name of Union

---
Street

---
City                                State                              Zip Code

---
By

---
Witness

**Labor Relations Division**
**Ohio Contractors Association**
**Copy**

*CH 9263*     *46 OH*     (F)

RECEIVED OCT 2 0 1994

# ASSENT TO
## COLLECTIVE BARGAINING AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration the undersigned employer,- although not a member of the Labor Relations Division of the Ohio Contractors Association, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the Labor Relations Division of the Ohio Contractors Association with Local Union 46 of the International Union of Bricklayers and Allied Craftsmen including all of the provisions therein and any amendments made thereto, and including those provisions pertaining to contributions to Trust Funds, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required, and authorizes these parties to name the Trustees to administer said Funds and ratifies and accepts such Trustees and the terms and conditions of the Trusts as if made by the undersigned.

L. M. R. Construction Co., Inc.
Name of Company

15152 Hemlock Pt. Rd.
Street

Chagrin Falls          OH          44022
City                   State       Zip Code

216-338-1296
Company Phone Number

Louise M. Riebelman   President
Authorized Representative and Title

10-11-94                    #1129005
Date                        Ohio Workmen's Compensation No.

IUBAC       LOCAL 46    OHIO
Name of Union

1310    SILER  ST.
Street

FREMONT        OHIO          43420
City           State         Zip Code

Steve Shively - FIELD REP.
By

Dale D. Marcks
Witness

## Union Copy

— 15 —

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LMR CONSTRUCTION CO., INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)    Civil Action No. 07-1676 (RMC)<br>)<br>)<br>)<br>)<br>) |

## JUDGMENT

The Summons and Complaint in this action having been duly served on the above-named Defendant on November 13, 2007, and the time for said Defendant to appear and defend herein having expired, and Defendant not having filed an Answer, and the Clerk having entered default, and the Plaintiffs having filed a declaration of a total amount due of $42,475.46 and Plaintiffs having moved for entry of judgment by default in that amount, it is hereby

ORDERED, ADJUDGED, AND DECREED that the final judgment in favor of Plaintiffs and against Defendant is hereby granted and ordered entered as the judgment in this action as follows:

1.     That Plaintiffs John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano. H. J. Bramlett, Eugene George, Paul Songer, William McConnell, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent Delazzero, and Benjamin Capp, all of whom are Trustees of, and sue on behalf of, the Bricklayers & Trowel Trades International Pension Fund ("IPF"), 620 F Street N.W., 7th Floor, Washington, DC 20004, and Jim Allen, Matthew Aquiline, Lon Best, James Boland, Ted Champ, Raymond Chapman, Vincent

2389825.01

Delazzero, Bruce Dexter, John Flynn, Eugene George, Gregory Hess, Fred Kinateder, Dan Kwiatkowski, Ken Lambert, Santo Lanzafame, Dick Lauber, William McConnell, Edward Navarro, Gerald O'Malley, John Phillips, Charles Raso, Mark Rose, Kevin Ryan, Gerard Scarano, Michael Schmerbeck, Paul Songer, Joseph Speranza and Fred Vautour, all of whom are Trustees of, and sue on behalf of, the International Masonry Institute ("IMI") recover from Defendant, LMR Construction Company, Inc., 13271 Bass Lake Road, Chardon, OH 44024 the amount due of $42,476.46;

2.    That LMR Construction Co., Inc. be directed to submit all monthly reports and contributions that may come due the Plaintiffs subsequent to the filing of this judgment;

3.    That LMR Construction Co., Inc., comply with its obligations to make timely and full contributions to the IPF; and

4.    That said judgment is without prejudice to the right of Plaintiffs to seek recovery of any past or future delinquencies, interest, damages and reasonable attorney's fees and costs that may be owing to the Plaintiffs from LMR Construction Co., Inc.

ORDERED, ADJUDGED AND DECREED that Plaintiffs have execution therefor.

Dated: _____, 2008        _____
                                                            Rosemary M. Collyer
                                                            United States District Judge

2389825.01

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN FLYNN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1676 (RMC) |
| | ) | |
| LMR CONSTRUCTION CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## LOCAL RULE 7(K) STATEMENT

Pursuant to Local Rule 7(k), the following persons are entitled to be served with

orders, judgments and stipulations:

> Ira R. Mitzner, Esquire
> Dickstein Shapiro LLP
> 1825 Eye Street, N.W.
> Washington, D.C.  20006-5403
>
> LMR Construction Co., Inc.
> 13271 Bass Lake Road
> Chardon, OH  44024

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion for Entry of Default Judgment with the Declaration of David F. Stupar, Declaration of Ira R. Mitzner, proposed Judgment, and Local Rule 7(k) Statement was served by first class mail, postage prepaid, this 5th day of March 2008, upon:

> LMR Construction Co., Inc.
> 13271 Bass Lake Road
> Chardon, OH  44024

Joanne Jackson

2389872.01